USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 96-1224 DARLENE F. MORRISON, Plaintiff, Appellee, v. CARLETON WOOLEN MILLS, INC. and MICHAEL RILEY, Defendants, Appellants. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Eugene W. Beaulieu, U.S. Magistrate Judge] _____________________ ____________________ Before Selya, Circuit Judge, _____________ Campbell, Senior Circuit Judge, ____________________ and Boyle,* Senior District Judge.  _____________________ ____________________ David J. Kerman with whom Robert Lewis and Jackson, Lewis, _________________ _____________ ________________ Schnitzler & Krupman were on briefs for appellants. ____________________ Peter B. Bickerman with whom Robert J. Stolt, Walter F. McKee and __________________ _______________ _______________ Lipman & Katz, P.A. were on brief for appellee. ___________________ ____________________ March 19, 1997 ____________________  ____________________ *Of the District of Rhode Island, sitting by designation. CAMPBELL, Senior Circuit Judge. These appeals and ____________________ cross-appeals relate to actions heard in the district court arising from federal and state claims of sexual harassment, sex discrimination, and disability discrimination brought by Darlene F. Morrison against her employer Carleton Woolen Mills, Inc. (the "Company"), and two of her supervisors, Michael Riley and Lee Moody. We affirm certain parts of the district court's judgment and reverse others. I. In Count I of her amended complaint, Morrison alleged that she was subjected by Carleton and the other defendants to sexual harassment, in violation of the Maine Human Rights Act, 5 M.R.S.A. 4551, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq. In Count __ ___ II, she alleged violation of the same state and federal statutes by reason of sex discrimination. In Counts III and IV, Morrison alleged that defendants had subjected her to discrimination on account of disability, in violation of the Maine Human Rights Act and the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. 12101 et seq.  __ ___ Trial before a jury began in the district court on October 4, 1994.1 The Title VII claims of sexual harassment  ____________________ 1. By consent of the parties, a United States Magistrate Judge presided over the jury trial and subsequently determined the various non-jury issues. 28 U.S.C. 636(c) (West 1993). -2- (Count I) and sex (gender) discrimination (Count II) were presented to the jury but only insofar as these claims were based upon conduct occurring on or after November 21, 1991, the effective date of the 1991 Civil Rights Act. See ___ Landgraf v. USI Film Products, 511 U.S. 244 (1994). The ADA ________ __________________ disability discrimination claim (Count IV) was likewise presented to the jury. However, the Maine law claims for sexual harassment, sex discrimination and disability discrimination, and the Title VII claims for pre-November 21, 1991 conduct did not go to the jury but rather were reserved for later decision by the magistrate judge. During the jury trial, the court, upon defendants' motion, dismissed as a matter of law all the claims (jury and non-jury) against Moody and many of the claims against Riley, to wit, the claims for sexual harassment (Count I) after November 21, 1991, for sex discrimination (Count II), and for disability discrimination (Counts III and IV). The court denied the Company's motions to dismiss the claims against itself. On October 14, 1994, the jury returned verdicts in Morrison's favor on her Title VII post-November 21, 1991 sexual harassment claim (Count I) and her ADA disability claim (Count IV). The jury awarded Morrison $50,000 in compensatory damages and $100,000 in punitive damages. The -3- jury found against Morrison, and in favor of the Company, on her Title VII gender discrimination claim (Count II). On April 10, 1995, the court issued its Memorandum of Decision deciding the non-jury claims that it had reserved for bench determination. On Count I, the court found that Morrison had been subjected to sexual harassment sufficiently severe and pervasive to create a hostile work environment prior to November 21, 1991. Consequently, it ruled in Morrison's favor, and against the Company and Riley, on her Maine law sexual harassment claim, and also on her Title VII sexual harassment claim for conduct prior to November 21, 1991. The court assessed a civil penalty for $10,000 under state law. 5 M.R.S.A. 4613(2)(B)(7) (West Supp. 1996). On Count II (gender discrimination) the court found no incidents of gender discrimination before November 21, 1991. It, therefore, ruled in favor of the defendants and against Morrison under Title VII. The court determined, however contrary to the jury's Title VII verdict that, after November 21, 1991, Morrison had been subjected to gender discrimination, finding the Company liable under the Maine Human Rights Act.2 The court declined, however, to  ____________________ 2. In making this finding, the court specifically noted that, in differing with the jury, it did not intend to suggest that the jury lacked sufficient evidence from which to conclude contrary to the court's findings. "The Court simply disagrees with the jury's conclusion in certain respects." -4- award her back pay, because it would be duplicative of the jury's damages award. Finally, as to Count III, the court determined that plaintiff had not been disabled within the meaning of Maine law, and hence found against Morrison and for defendants on the Maine law disability claim. In determining that Morrison was not disabled, the court found that the Company "did not perceive her to be unable to perform a major life activity, specifically work." The court noted that the Company had only perceived Morrison as incapable of performing the single position of floorperson. Defendants' post-trial motions for judgment as a matter of law, for new trial, and other relief were denied. Plaintiff's own motion for new trial was also denied. The Company and Riley appeal, and Morrison cross- appeals, from the judgment and the rulings on the various motions below. Morrison has since expressly waived her cross-appeal from the jury's adverse verdict under Count II (gender discrimination). II. The evidence at trial, construed in the light most favorable to Morrison, showed essentially the following. On August 23, 1983, Morrison was hired by the Company to work as a "spinner" in the spinning department. Later that year, Morrison bid on and was awarded the position -5- of "sewer." Months later, she bid on and was awarded the position of "coner" in the yarn preparation department. Morrison held this position from approximately May of 1984 until January of 1987. All the positions held by Morrison up to this time were traditionally filled by female employees. In December 1986, Morrison bid on the position of "temporary floorperson" on the third shift in the yarn preparation department. At this time, Riley was the shift supervisor on the third shift in the yarn preparation department. Riley was angry with Morrison for bidding on the floorperson position. Prior to December 1986, Morrison had once had an angry encounter with Riley when they both worked on the second shift. Riley had screamed at her for leaving her machine to go to the restroom. A month later, Morrison was awarded the temporary floorperson position. As shift supervisor, Riley approved her transfer to the position and certified her satisfactory completion of the thirty-day probationary period. However, he had no discretion under the Company's contract with the Union to refuse a position to the most senior qualified person who bid on it, which, in this case, was Morrison. When Morrison told Fred DeVaudreuil, the department supervisor and Riley's superior, that she had been awarded the floorperson position, he asked her to reconsider taking it. He indicated that the Company was not happy with her -6- getting the job. Morrison believed that he was concerned thatshewould beinjured andassured himthatshe wouldbe careful. In April 1987, seven female employees of Carleton filed a formal grievance against Riley, charging that he was harassing employees at the Company by yelling, making false accusations and threatening their jobs. The Company responded by stating that it did not condone shouting by anyone, but that employees must recognize that they are not at liberty "to ignore management directives or to be tardy in following them." Ultimately, this grievance was resolved informally, with Plant Manager Everett Owens advising Riley about the need to be more "low key."  In February 1988, Morrison bid on the permanent opening for the position of floorperson on the third shift. Once again, Riley became very angry, telling Morrison that the job was not for her, and that she was taking jobs away from men. Days after Morrison was awarded the floorperson bid, Riley told her that she was going to regret it, and that sooner or later he was going to get her out of the job. The floorperson is responsible for bringing boxes of yarn on bobbins to the machine operators, for taking full cones of yarn, weighing them and storing them, and for changing the warp beams. Changing a warp beam, which can weigh up to 1,100 pounds when full of yarn, involves several -7- steps. First, the warp is removed from its cradle with a crow-bar type of tool. The warp then drops about two inches, after which it must be rolled to where it can be picked up by a hydraulic lift and moved into a storage area. Morrison remained in the floorperson position until March of 1989. During that time various incidents occurred that are relevant to the present action. After changing a warp beam, Morrison went to wash her hands. When she left the restroom moments later, Riley was waiting for her. He accused her of being in the restroom for a long time and threatened to write her up. Riley took Morrison into the plant manager's office. He then told her that he was a big person within the Company and that "any woman would be proud to have a man in a position like this." Several female employees complained that the room was too hot because of the machinery. They asked Riley if he could open more of the ceiling vents. Riley said he thought that they were just having "hot flashes", and walked away. Riley threatened to fire Morrison if she did not drive his girlfriend (and future wife) and co-employee, Juanita Courtney, to her house from work during her shift. Riley told several people in Morrison's presence that the other female floorperson, Linda Paul, was able to -8- stay in such a position because she and Moody patted each other on the rearend. Morrison reported a problem with a box of yarn to Riley, who told her she was probably so dumb she created the problem herself. Riley told Morrison that Courtney was pregnant. He said "you thought I was too old, didn't you", and "I showed you." In March 1989, Morrison accepted a position as the medical clerk for the Company nurse, Lucille Turner. Two months later, Morrison decided that she wanted to return to her former position. In October 1989, Morrison bid on a temporary coner, fixer and tender ("fixer") position. Riley flew into a rage, telling Morrison that she was "stepping out of bounds" and that "her place was in the kitchen." Thereafter, Morrison bid on a permanent fixer position. Riley told her fellow workers that if she got the job, she would have to travel to a training seminar and share a motel room with Moody and another male worker. Morrison voided her bid in an effort to stop speculation about the seminar, and returned to her floorperson position. In June 1990, a first shift floorperson, William Rogers, asked Morrison to swap shifts with him. Even though Riley had moved to the first shift, Morrison agreed to the -9- switch. Riley told Morrison that he "was not going to put up with any bullshit on the first shift" and that he "had enough bitches in the first shift." Riley also called a male co- worker over to where he and Morrison were standing and began patting him in the rearend, and told her that she would have to get used to such behavior in the first shift. Riley and Moody moved their desk near the women's restroom, explaining that they wanted to watch the usage of the restroom so that they could write female workers up for abusing the privilege of using the restroom. Also, they regularly made comments about Morrison bending over boxes to the point where she felt very uncomfortable having to do so. Other incidents occurred between the spring of 1990 and the fall of 1991. Riley handed Morrison a piece of paper, which he said was an application for a fixer position. She turned over the paper and discovered, to her annoyance, that it was entitled "Application for a Piece of Ass."  Riley gave Morrison an ink-blot that, when folded, depicted various sexual acts involving persons and animals. He called her a "dumb broad" for being unable to properly fold it, after which he folded it for her. Morrison became very upset and called Riley a "filthy pig." Riley told Morrison that Moody wanted to do "funny things" to her body, although Moody later denied ever making -10- such a comment. On another occasion, Moody approached Morrison and told her that he would like to see her naked. Moody handed Morrison a document entitled "Canadian Condom Marketing Board", which contained sexually-oriented attempts at humor. Morrison asked Moody why he was doing this, and he replied something to the effect that he takes his orders from the office. Riley asked Morrison if she knew what a man with a ten-inch penis eats for breakfast. When she did not respond, he proceeded to tell her what he had eaten for breakfast. Riley gave Morrison a document entitled "Proposed Restroom Policy." This document, another crude attempt at humor, informed employees that if they occupied the bathroom stalls for more than three minutes, certain events would occur, including the taking of their photographs in the stalls. Riley regularly screamed and hollered at the women employees in the yarn preparation department, but not at the men. If any of the women indicated that they might complain about his behavior, he would tell them "pay-back's a bitch." During this period of time, Morrison went, on two occasions, to the office of Annette McGowan, the Company's personnel manager, to complain about Riley's harassing behavior. On neither occasion was Morrison allowed to speak -11- with McGowan. McGowan's secretary told Morrison that she would not be allowed to see McGowan without her supervisor's permission, even though Morrison informed her that her complaint was about Riley, her supervisor. In May 1991, Morrison injured her shoulder at work. She kept working, but was eventually diagnosed with tendinitis, and told to take ibuprofen and learn to pace herself. In October 1991, Morrison injured her back at home while she was making her bed. Morrison went to the Belgrade Regional Health Center where she saw Gretchen Hill, a registered nurse-practitioner. Hill found that Morrison appeared to have a lower lumbar muscle strain without any disc problems. Hill informed Turner, the Company's nurse, that Morrison would be absent for one week.  Morrison returned to see Hill one week later. By that time, the pain was gone, although she was experiencing some stiffness. Hill was considering allowing Morrison to return to work, so she called Turner again. Turner suggested that Morrison should be kept out of work for two more weeks, a suggestion that Hill accepted. On November 8, 1991, Hill issued Morrison a return to work slip for full activity. Hill testified that she would have preferred Morrison to work in a limited capacity for a short period of time, but she felt that Morrison could -12- successfully return to work without restriction. Following another conversation with Turner, Hill wrote a new note on November 13, 1991, which suggested that Morrison be placed on light duty work from November 11 through November 22, and then return to regular duty. Turner and McGowan met with Morrison and informed her that the Company had no light duty work available at the time. McGowan then offered Morrison the option of bidding into a different position, or accepting a layoff slip, which would entitle her to unemployment benefits. Morrison did not want to lose her floorperson seniority by bidding into a different position, so she accepted the layoff. Morrison believed that she had medical clearance to return to regular duty after November 22, 1991, and so, on November 25, 1991, she went to the yarn preparation department and sought to punch in. Morrison could not find her own timecard, and asked Moody where she could find it. Moody responded by saying, "Girlie, I don't know. You're not coming back to my department. Go see nursie." Morrison felt "stupid."  Turner told Morrison that she remained on layoff, and that she had no authority to allow her to work. Turner advised Morrison to speak with McGowan. McGowan informed Morrison that she did not have the authority to return her to work absent medical clearance, and suggested that she see Dr. -13- Barron, the Company's physician. On November 26, 1991, the next day, Morrison went to see Dr. Barron. The examination of Morrison consisted of the nurse taking her blood pressure, temperature and weight, and the doctor asking her how she felt. Dr. Barron advised Morrison that he would be going to view the floorperson position, but he reported to her (and wrote in his office notes) that he saw no physical reason why she could not return to work.  After he viewed the floorperson position, Dr. Barron wrote the following notation: "I feel that [Morrison] can do most of the work without any problems. However, when it came to watching the warp removed, I felt that this was far too much for a woman with tendinitis and a back problem. I understand that these warps weigh in the neighborhood of 500 pounds and the manipulation of moving them onto a hydraulic lift is certainly more than she can do. Over a period of time, I feel that she would be crippled doing this job. With tendinitis and back problems within a year she will be out of work and on disability. My recommendation is that she not be put on this type of job." Dr. Barron did not speak to Morrison's treating physician or her nurse-practitioner. Dr. Barron disregarded their opinions which indicated that Morrison was capable of fulfilling her duties, because they had not seen the floorperson position. At the time of trial, Morrison was still not permitted to work in the floorperson position on the basis of Dr. Barron's evaluation. -14- On November 23, 1992, Morrison returned to work after she decided to bid on a fixer position. She received the position, although after a month she was "bumped", was laid off for a few weeks, accepted a creeler position, and eventually returned as a fixer. After a dispute over being paid as a temporary fixer, Morrison finally attained permanent fixer status. Since she returned, Morrison has worked primarily on the third shift, under different supervisors from Riley and Moody. Morrison testified that she had no problems with Riley and Moody after she returned as they stayed away from her. The Company's personnel manager told Morrison that she had spoken to the people Morrison would be working with and that they would not harass her about her former complaints. Morrison was to report back any complaints she might have.  Morrison further testified, however, that, after her return, most of her co-workers would no longer speak to her. She felt that this was due to the fact that most of those who spoke to her were harassed afterwards by supervisors for doing so. Also, the third shift supervisor, Ernest Clark, often criticized Morrison for her job performance. The Company, moreover, never asked Morrison to substitute when the floorperson was absent, even though employees with less experience were asked to do the floorperson's job. And finally, Morrison became very upset -15- and angry when she saw a petition, expressing support for Riley and Moody, being circulated among Carleton employees. III. Defendants appeal from the adverse jury verdicts, from the adverse findings of the district court and from the denial of various motions including their motion for judgment as a matter of law. A federal district court may not set aside a jury verdict and direct the entry of a contrary verdict, unless no reasonable jury could have returned a verdict adverse to the moving party. Jacques v. Clean-Up Group, Inc., 96 F.3d 506, _______ ____________________ 509 (1st Cir. 1996). In making this determination, the court examines the evidence adduced at trial in the light most favorable to the nonmoving party, drawing all reasonable inferences in its favor. Id. On appeal, we review the ___ district court's determination de novo, applying the same __ ____ standards. Id. ___ Our review of a district court's own findings of fact is for clear error only; we review its legal rulings de __ novo. Damon v. Sun Co., Inc., 87 F.3d 1467, 1483 (1st Cir. ____ _____ ______________ 1996). IV. A. Sexual Harassment (Count I) ______________________________ Title VII of the Civil Rights Act of 1964 provides that it is an "unlawful employment practice for an employer -16- . . . to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's . . . sex." 42 U.S.C. 2000e-2(a)(1) (West 1994). The Maine Human Rights Act, likewise, provides that it is unlawful employment discrimination for an employer to discriminate against an employee on the basis of sex "with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment . . . ." 5 M.R.S.A. 4572(1)(A) (West Supp. 1996).3 In 1980, the Equal Employment Opportunity Commission ("EEOC") promulgated guidelines specifying that sexual harassment is a form of employment discrimination based on sex in violation of Title VII. See 29 C.F.R.  ___ 1604.11 (1996). Under Title VII, "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitutes sexual harassment when: (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; (2) submission or rejection of such  ____________________ 3. The Maine courts have relied on the federal case law surrounding Title VII for the purpose of construing and applying the provisions of the Maine Human Rights Act. See ___ Bowen v. Department of Human Servs., 606 A.2d 1051, 1053 (Me. _____ __________________________ 1992). We, therefore, apply the same legal standards in considering whether or not the evidence was sufficient to support determinations under both the state and federal statutes. -17- conduct is used as the basis for employment decisions affecting such an individual; or (3) such conduct has the ______________________ purpose or effect of unreasonably interfering with an _____________________________________________________________ individual's work performance or creating an intimidating, _____________________________________________________________ hostile or offensive working environment." 29 C.F.R.  ___________________________________________ 1604.11(a) (1996) (emphasis added). In Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 _________________________ ______ (1986), the Supreme Court confirmed that a violation of Title VII can be established through evidence of an abusive, hostile or offensive work environment. Quoting from the EEOC guidelines, the Supreme Court stated that the existence of sexual harassment must be assessed "in light of the record as a whole and the totality of the circumstances." Id. at 69; ___ see also Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 _________ ______ ____________________ (1993) (relevant factors, though no single one is required, include the frequency of the discriminatory conduct; its severity; whether it is threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance). In Lipsett v. University of Puerto Rico, 864 F.2d _______ __________________________ 881, 897-98 (1st Cir. 1988) (quoting Meritor Savs. Bank, FSB, _______________________ 477 U.S. at 67)4, this court held that, for sexual harassment  ____________________ 4. We note that the plaintiff's claims in Lipsett actually _______ proceeded under Title IX of the Civil Rights Act of 1964.  This court, however, viewed the standards for sexual harassment claims under Title IX to be equivalent to those used under Title VII. See Lipsett, 864 F.2d at 899.  ___ _______ -18- to be actionable, "it must be 'sufficiently severe or pervasive to . . . create an abusive working environment.'" See also Harris, 510 U.S. at 21. We said that an employer _________ ______ "is liable upon a finding of hostile environment sexual harassment perpetrated by its supervisors upon employees if an official representing that institution knew, or . . . should have known, of the harassment's occurrence, unless that official can show that he or she took appropriate steps to halt it." Lipsett, 864 F.2d at 901. _______ Claimants under Title VII were, until recently, limited to the equitable remedies of injunctive relief and back pay. The 1991 Civil Rights Act, which became effective on November 21, 1991, amended Title VII, and, for the first time, authorized individuals alleging intentional unlawful discrimination to seek compensatory and punitive damages against their employers. The 1991 Act also conferred upon Title VII plaintiffs the right to a trial by jury. See 42 ___ U.S.C. 1981a(b)-(c) (West 1994). In Landgraf, the Supreme ________ Court held that the right to such damages and to a jury trial did not apply to conduct that occurred prior to the effective date of the Act, i.e. prior to November 21, 1991. Landgraf, ________ 511 U.S. at 244-45. Pursuant to Landgraf, Morrison's Title VII sexual ________ harassment claim was tried to the jury only insofar as based upon conduct on and after November 21, 1991. Insofar as the -19- Title VII harassment claim was for conduct prior to that date, it was tried to the magistrate judge, who also determined in its entirety Morrison's claim that the alleged sexual harassment violated the Maine Human Rights Act. Because Title VII damages were only recoverable for post- November 21, 1991 sexual harassment, that date assumes great importance here. 1. Before November 21, 1991 ________________________ During the pre-November 21, 1991 period, as to which the magistrate judge rather than the jury was the trier of fact, the court determined under Count I that Morrison "was subjected to sexual harassment sufficiently 'severe or pervasive enough to create an objectively hostile or abusive work environment'", quoting Harris, 510 U.S. at 21. The ______ court also found that Morrison "'subjectively perceive[d] the environment to be abusive.' Id." This hostile environment ___ was found to have existed prior to November 21, 1991, and the Company was found to have known about it, or should have known about it, because it was so pervasive. The Company's plant manager and plant supervisor5 were found to have worked in the same general area as plaintiff and Riley, "and could  ____________________ 5. Carleton and Riley point out in their appellate brief that there is no such position as "plant supervisor" at the Company, nor was there any testimony at trial about any comparable position. Notwithstanding any error in this particular, we uphold the court's finding of knowledge. Infra. _____ -20- not have missed the discriminatory atmosphere that permeated the department." Based on these conclusions, the court found against the Company and Riley on Morrison's claims of hostile environment sexual harassment under Maine law and under Title VII for conduct occurring before November 21, 1991. We find ample record evidence to sustain these findings. As an initial matter, we turn to defendants' contention that the federal and state statutes of limitations do not allow us to look at any conduct antedating the middle of 1991 in support of the hostile environment claims. Section 2000e-5(e)(1) of Title VII provides that claimants must file a charge of discrimination with the EEOC within 300 days of the alleged discriminatory act. 42 U.S.C. 2000e- 5(e)(1) (West 1994). Section 4613(2)(C) of the Maine Human Rights Act states that "[t]he action shall be commenced not more than two years after the act of unlawful discrimination complained of." 5 M.R.S.A. 4613(2)(C) (West 1989). Since Morrison filed her charge with the EEOC on April 23, 1992, and her complaint with the district court on September 3, 1993, the appellants argue that only acts of sexual harassment occurring after June 27, 1991, for her federal claim, and after September 3, 1991, for her state claim, should be considered in reviewing the sufficiency of the evidence. We disagree. The district court found that the hostile environment at Carleton had existed for a number -21- of years prior to November 21, 1991 and continued beyond September 3, 1991. We have held that there is no prohibition on recovery for earlier conduct if the "systemic violation" extends into the limitation period. See Jensen v. Frank, 912 ___ ______ _____ F.2d 517, 523 (1st Cir. 1990). Here, the systemic violation continued without interruption from the late 1980's onward through September 3, 1991. It was, therefore, appropriate for the district court to look at defendants' conduct dating back to the 1980's, and we may do likewise, in evaluating Morrison's federal and state sexual harassment claims. From the late 1980s into the fall of 1991, there was ample evidence of crude, demeaning and sexually-oriented behavior by Riley and others directed at Morrison. A rational factfinder could conclude that the harassment was so severe or pervasive that it created a work environment abusive to Morrison because of her gender. Harris, 510 U.S. ______ at 22. There is, indeed, evidence that the harassment went so far as to adversely affect Morrison's ability to function, by making her fearful to apply for certain employment opportunities and undermining her mental and emotional well- being. Even so, the appellants argue that the Company, as an entity, cannot be held liable because Morrison has not shown that it knew, or should have known, of the harassment. Morrison did not complain of harassment to the Company during -22- the period, even though there were procedures available to file such complaints. This is a closer question, but we find sufficient evidence to support the finding of the magistrate judge that the Company knew or should have known that the hostile environment existed despite plaintiff's failure to use official procedures to complain. In April 1987, several female employees of Carleton had filed a grievance against Riley, alleging that he was harassing them. At that time, Plant Manager Everett Owens told Riley to be more "low key", but never took any action to discipline or more closely supervise him. In the years before the trial of this case, Union President Gwendolyn Gatcomb brought several complaints concerning Riley's behavior to the attention of Company personnel. In spite of these complaints, Riley and other Carleton supervisors were allowed to continue with their responsibilities and their harassing conduct. Morrison testified that she had tried to bring the matter to the attention of Personnel Manager Annette McGowan, but had been unable to see her. The magistrate judge found that the layout of the mill was such that higher management "could not have missed the discriminatory atmosphere that permeated the department." We are satisfied that the evidence sufficiently supports the court's above finding, and can see no justification to disturb it on appeal. 2. After November 21, 1991 _______________________ -23- For us to affirm the jury's award of damages to Morrison on her Count I Title VII sexual harassment claim, the record must reveal evidence of conduct on or after November 21, 1991 the effective date of the 1991 Civil Rights Act sufficient to have created a hostile environment as that term is used under Title VII. Landgraf, ________ 511 U.S. at 244-45. Hostile environment sexual harassment is a particular species of sex discrimination. The EEOC's regulations, as noted, describe it as "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature . . . when . . . (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." 29 C.F.R. 1604.11(a) (1996). The Supreme Court speaks of a "workplace . . . permeated with 'discriminatory intimidation, ridicule and insult' . . . that is 'sufficiently severe or pervasive to alter the conditions of a person's employment and create an abusive working environment.'" Harris, 510 ______ U.S. at 21 (citations omitted). In the present case, the jury heard extensive evidence of the vulgar pre-November 21, 1991 incidents which, as we have held, amply support the magistrate judge's finding of hostile environment sexual harassment during that earlier time. However, the jury's task was to determine Title VII -24- liabilities and damages for the period from November 21, 1991 onward. The jury could take the earlier conduct into account only to the extent it was legally relevant to what later happened for example, to help prove the intent behind an act committed after November 21, 1991, or the act's likely effect on someone like Morrison. See, e.g., Fed. R. ___ ____ Evid. 402, 403, 404(b), 406, 412. The earlier abuse is no substitute for proof of actual sexual harassment occurring in the post-November 21, 1991 period. Because we cannot find evidence of sexually abusive conduct in this later period sufficient to support the jury's Title VII award under Count I, we are obliged to reverse that part of the verdict.  From October 19, 1991 until November 23, 1992, Morrison was either on medical leave or on layoff from Carleton, hence she could not, during that period, have been subjected to workplace abuse, nor could her work performance at Carleton have been interfered with by abusive conduct while there. The only incident during that period that might be construed as workplace sexual harassment occurred on November 25, 1991, when Morrison went to Carleton seeking to return to work. Moody refused to let her punch in, telling her she had first to get medical clearance. In turning her away, Moody called Morrison "Girlie" and told her to go see "nursie", raising the question whether use of these terms made Moody's remark so offensive as to support a finding of -25- hostile environment sexual harassment. In order to assess Moody's probable intent when he spoke as he did on November 25, 1991 and the reasonable effect of the phraseology on Morrison, see Harris, 510 U.S. at 22 (citing Meritor Sav. ___ ______ ____________ Bank, FSB, 477 U.S. at 67), the jury could consider the __________ evidence of Moody's and others' prior offensive conduct and remarks in the period before November 21, 1991. In light of that history, the jury could reasonably construe Moody's use of the terms "Girlie" and "nursie" as demeaning, rather than as merely light-hearted banter, and could also determine that Morrison had reason to be offended. Morrison testified that Moody's remark, made at a time when "everybody was lined up getting ready to punch in", made her feel "stupid." We are unable to conclude, however, that Moody's "Girlie-nursie" remark was, by itself, a sufficient basis to hold the Company liable to Morrison under her Title VII sexual harassment claim. Morrison was not working at the time. Her contact on this one day with the Company's work environment was fleeting. There is no evidence the Company knew of or sanctioned Moody's particular phraseology. We know of no case where a single, brief encounter of this mildly offensive sort, at a time when the plaintiff was not actually working, and hence could not be affected in her work performance and conditions of employment, has been held to create a sexually hostile workplace environment. See, e.g., ___ ____ -26- Harris, 510 U.S. at 21 (conduct must be severe or pervasive ______ enough to create an objectively hostile or abusive work environment affecting employee's conditions of employment); Chamberlin v. 101 Realty, Inc., 915 F.2d 777, 783 (1st Cir. __________ _________________ 1990) (single or isolated remarks do not establish a hostile environment). Even assuming this incident, when coupled with the more serious pre-November 21, 1991 incidents, might lead a rational jury to conclude that the earlier abusive environment would have remained the same through November 25, 1991, the fact that Morrison was not working at Carleton from November 21, 1991 until November 23, 1992 a year later  makes this conclusion largely irrelevant to her claim for damages during this period. Morrison could not have been injured by hostility at a workplace she did not attend.6 We realize that Morrison contends that she accepted layoff status only because of the Company's refusal during this period to let her return to her floorperson position. Morrison insists that the refusal, while supposedly based on health concerns, was actually based on the Company's bias against women working as floorpersons. The jury, however, specifically rejected Morrison's Count II, Title VII sex  ____________________ 6. Obviously, an award of $150,000 in compensatory and punitive damages would be patently excessive for one mildly offensive remark. Even supposing the workplace itself remained potentially abusive during Morrison's absence, this would be irrelevant while she was on layoff status and not present. -27- discrimination claim premised on such a theory, finding for the Company on Count II. The magistrate judge, contrary to the jury, later upheld Morrison's sex discrimination claim under Maine law, holding that the Company's refusal to allow _______________ Morrison to go back to her floorperson position was gender- based and discriminatory. But the jury's verdict is conclusive on the part of the Count II claim seeking damages under Title VII. The jury found for Morrison on her Count I claim of hostile environment sexual harassment, but, as we discuss here, there was insufficient evidence of abuse during the post-November 21, 1991 period for us to affirm the award of damages under that theory.7  Following the period of over a year during which she did not work at the Company (from October 19, 1991 until November 23, 1992), Morrison finally returned to work. But the record covering the period after Morrison's return to work on November 23, 1992 provides scant support for her hostile environment claim. When she returned, she accepted a different, somewhat higher-paying position8, and reported to  ____________________ 7. The jury's finding against Morrison under Count II refutes any argument that the jury based its Count I sexual harassment verdict on a finding that Morrison was discriminated against when denied the opportunity to return to the floorperson position. Cf. Chamberlin, 915 F.2d at __ __________ 782-83. 8. The Company's personnel manager testified that, at the time of trial, a fixer was paid $9.64 per hour, while a floorperson was paid $8.54 per hour. Morrison herself testified that a similar pay difference existed in 1989 when -28- new supervisors. There is no evidence that, in this new position, her supervisors, or any other person for that matter, subjected her to "discriminatory intimidation, ridicule and insult", Harris, 510 U.S. at 21, much less to ______ sexually offensive, embarrassing or vulgar conduct or remarks, or other sex-based conduct or remarks, such as had occurred prior to November 21, 1991 when she was working as a floorperson under Riley. The Company's personnel manager advised her that employees had been warned to treat her fairly and equitably, and that she was to report anything offensive immediately so that it could be corrected. Morrison did not thereafter complain of sexual harassment to Company personnel. Morrison conceded that her old nemeses, Riley and Moody, stayed away from her, and never harassed her after she returned to work. Morrison, nonetheless, points to certain incidents that occurred during this later period, which, according to her, gave rise to a hostile work environment at Carleton. Morrison testified that most of the people with whom she had worked for years would no longer speak to her when she returned to work in November 23, 1992, ostensibly  ____________________ she had briefly worked as a fixer. There was a period shortly after her return when she was "bumped", laid off, returned as a creeler, and ultimately restored to fixer status. Morrison and the Company thereafter skirmished over her fixer pay scale, whether it was temporary or permanent; eventually she got the permanent rating. -29- because discouraged by management from doing so. The few that did were reprimanded by their supervisors afterwards. Morrison felt that some of her co-workers would no longer cooperate with her, thereby making her job much more difficult, and that one of her new supervisors, Ernest Clark, would occasionally assign her excessive work. Ernest Clark, according to Morrison, would also follow her around and look for flaws in her work, and would often blame her for mistakes that were not of her own doing. Morrison further complained that, for some time after she had completed a training period, she received temporary pay, instead of regular pay, for her work as a fixer, and that, despite her seniority, she never was asked to fill in for those employees with higher- ranking jobs within the Company. Lastly, Morrison claimed that she saw a petition expressing support for Riley and Moody circulating throughout the Company, an event that, she says, led her to seek professional counselling.  Morrison argues that she does not need to show that management's conduct during this later period was "expressly sexual" in order to establish a sexually hostile work environment based on gender discrimination. We accept that many different forms of offensive behavior may be included within the definition of hostile environment sexual harassment. See Spain v. Gallegos, 26 F.3d 439, 447 (3d Cir. ___ _____ ________ 1994) (employee can show that there is a sexually hostile -30- work environment "without proving blatant sexual misconduct."). However, the overtones of such behavior must be, at the very least, sex-based, so as to be a recognizable form of sex discrimination. McKinney v. Dole, 765 F.2d 1129, ________ ____ 1138 (D.C. Cir. 1985). Merely because a supervisor is overbearing or fellow employees unsociable and hard to get along with, does not suffice unless underlying motives of a sexual or gender discriminatory nature are implicated. Spain, 26 F.3d at 449. _____ The post-November 23, 1992 conduct alleged by Morrison occurred over a year after the earlier sexually- explicit misconduct by the other supervisors in her former position. The later conduct, as said, was not the kind associated with a claim for hostile environment sexual harassment. See, e.g., Gross v. Burggraf Constr. Co., 53 ___ ____ _____ _____________________ F.3d 1531, 1546 (10th Cir. 1995) (employee did not establish a gender-based hostile environment by showing that employer reprimanded her in front of other employees, grilled her about some plans to bring discrimination charges against him, and told her "she was skating on thin ice."). It was not shown that Supervisor Clark's harshness was based on annoyance with her as a woman, or because he regarded the fixer position as off limits for women. A connection between Morrison's gender and the incidents she complains of was not established. The record contains no evidence that Morrison -31- complained to the Company that she was being subjected at this time to further sexual harassment or that the Company knew or should have believed that Morrison was being subjected to sexual harassment then. If the Company deliberately sought to isolate or punish Morrison for her earlier complaints of harassment, by telling other employees not to speak to her, such conduct might have supported a claim for unlawful retaliation, but not for sexual harassment.9 The evidence presented by Morrison is simply insufficient to establish a post-November 21, 1991 sexually hostile work environment created by severe or pervasive sex- based harassment. Morrison seeks to overcome the deficiencies in the evidence by contending that the more recent, non-sexual incidents could be linked to the pattern of vulgar, sexually- related misconduct that occurred at Carleton prior to the effective date of the 1991 Civil Rights Act. Morrison urges that the later incidents could be evaluated by the jury, not in isolation, but rather as a continuation of what she and  ____________________ 9. Title VII of the Civil Rights Act of 1964 has a separate statutory provision, not at issue here, making it an unlawful employment practice for an employer to discriminate against an individual because of his or her having opposed another unlawful practice or made a charge under the subchapter. 42 U.S.C. 2000e-3(a) (West 1994); see also Fennell v. First ___ ____ _______ _____ Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996) ____________________ (outlining the elements of a retaliation claim). -32- other employees encountered at the Company before November 21, 1991. This point might have arguable merit relative to Moody's "Girlie-nursie" remark on November 25, 1991, were it not for the isolated nature of this incident, occurring as it did when Morrison was on continuous leave, hence not at the workplace so as to be exposed to a hostile environment. As to the events after her return to work on November 23, 1992, the pre-November 21, 1991 harassment was too remote in time and character to transform the later conduct into the different kind of behavior needed to support a damages claim for hostile environment sexual harassment. Morrison, by then, was working in a new position with other supervisors. To establish that she was entitled to damages for being subjected to hostile environment discrimination during this later period, she had to show some conduct within that time frame fitting into a cognizable definition of abusive work environment harassment. If this were not so, the Company would be held liable for conduct which it would not have known was either improper or a source of potential liability under the "hostile environment" theory at issue. In light of the foregoing, we hold that there was insufficient evidence from which a rational factfinder could conclude that Morrison was subjected to a sexually hostile work environment at Carleton after November 21, 1991.  -33- B. Gender Discrimination (Count II) ________________________________ In Count II, the district court ruled in the Company's favor on Morrison's federal claim, finding that there were no incidents of sex discrimination against Morrison prior to November 21, 1991.10 The district court, _____ however, held that Morrison had established sex discrimination after November 21, 1991, and entered judgment in her favor under Maine law. We find that there is sufficient evidence in the record below to support the court's state law ruling and, accordingly, we affirm its judgment in this respect. The district court first found that Morrison was not permitted to return to her floorperson position on November 25, 1991 "because of Lucille Turner's, Annette McGowan's, and Dr. Barron's perception that women would more likely be severely injured in the floorperson position than would men." The record permits the inference that Morrison's injury was temporary and not especially serious. The evidence shows that Turner convinced Hill to extend Morrison's layoff, and later suggested that Morrison should  ____________________ 10. As with Count I, the issue of whether Carleton discriminated because of gender against Morrison after November 21, 1991 in violation of Title VII was presented to the jury. The jury found against Morrison on that claim, as noted. The magistrate judge subsequently found otherwise on the same facts for purposes of Morrison's Maine law sex discrimination claim, finding gender discrimination after November 21, 1991 based on the Company's refusal to let Morrison continue in the floorperson position. -34- not be allowed to return to the floorperson position. When Morrison was given the choice of either accepting a layoff or leaving the floorperson position, McGowan told her that "she should have seen this coming because . . . [the Company] did not want [her] on the job." Finally, even though Dr. Barron talked extensively with Turner about Morrison's physical condition, he refused to consult with her treating physician or her nurse-practitioner, both of whom felt she was fit to perform her floorperson duties, in recommending that she be kept out of the job. The district court stated that it was satisfied that "a man presenting the same medical history and clearance to return to work would have been immediately permitted to do so." The record below gives credence to this statement, as two long-time Carleton employees, William Rogers and Norman Williams, testified that the Company has permitted them to remain in their physically-demanding jobs, despite the fact that they have, respectively, a chronic back problem and a ruptured cervical disc. Moreover, Leland Rice, who, at one time, worked as a floorperson at Carleton, and who is only five foot three inches tall and weighs no more than 140 pounds, testified that he did not find any aspect of the job, including the removal of the warp beam, to be very difficult to perform. It could be found, therefore, that, while Carleton seized upon Morrison's relatively minor medical -35- problems to exclude her from the floorperson position, it allowed other male employees, with more serious ailments and less physical abilities, to continue working for the Company. It is true, to be sure, that there was also evidence suggesting that legitimate health-based considerations had motivated the Company's decision. But this is the kind of matter best sorted out by the trial court. There was sufficient evidence to support a reasonable trier's finding that Morrison was rejected because of her gender. The court was entitled to conclude that Morrison's sex "was a substantial motivating factor in the adverse employment decision." Cumpiano v. Banco Santander Puerto ________ _______________________ Rico, 902 F.2d 148, 155 (1st Cir. 1990). Finding no error, ____ we affirm. We also hold that, on remand, the court should reopen the issue of back pay given our vacation of the damages awards under Counts I and IV. C. Disability Discrimination (Count IV) ____________________________________ In Count IV, the jury returned a verdict in Morrison's favor on her federal ADA claim. When this claim was submitted to the jury, the court correctly told the jury that Morrison could recover only for violations of the Act occurring on or after July 26, 1992, the effective date of the Act. Because the record reveals no evidence of any post- July 26, 1992 violations, we are obliged to overturn the verdict.  -36- Ever since the ADA became effective on July 26, 1992, the courts have consistently held that the Act is not retroactive. Miller v. CBC Cos., 908 F. Supp. 1054, 1062 ______ _________ (D.N.H. 1995) ("there is little doubt the First Circuit would decline to extend the continuing violation theory to permit [plaintiff] to recover for the defendants' pre-ADA conduct."). As a result, to uphold a claim under the ADA, there must be evidence that the claimant was discriminated against because of a disability on or after July 26, 1992. Morrison's discrimination claim, however, is based on Carleton's rejection of her request, made in the fall of 1991, to be allowed to continue in the floorperson position that she had previously held. The Company's decision to bar her from the position was effectively made, and communicated to her, in November 1991, eight months before the statute's effective date. While Morrison grieved the decision through her union, in proceedings strenuously pursued through February of 1992, and while the grievance process itself appears to have continued into 1993, when the matter was stated to be arbitrated, its subject was the Company's alleged unfair practice in the fall of 1991. Morrison has not pointed to additional incidents that took place on or after July 26, 1992, which constituted separate violations of the ADA during the later period.  -37- The regulations promulgated pursuant to the ADA add nothing to Morrison's claim. These regulations prohibit disability discrimination with respect to " . . . layoff, termination, right to return from layoff, and rehiring." 29 ___________________________ C.F.R. 1630.4(b) (1996) (emphasis added). However, the denial of any right Morrison had to return from layoff was complete well before July 26, 1992. Morrison was denied the floorperson position in the fall of 1991 after she sought to return from medical leave. By then Morrison had already accepted a layoff slip in lieu of bidding on another job, and remained on layoff until November 23, 1992, when she accepted the "fixer" position with the Company. Morrison would have us find a continuing violation, based on a theory that not restoring her to her old floorperson position formed part of a continuous chain of misconduct extending beyond the July 26, 1992 deadline. But the Company's inaction is not enough. As we said in a somewhat analogous situation, "'it was incumbent upon [her] to allege facts giving some indication that the later refusals were themselves separate . . . violations.'" Velazquez v. Chardon, 736 F.2d 831, 833 _________ _______ (1st Cir. 1984) (quoting Goldman v. Sears, Roebuck & Co., 607 _______ ____________________ F.2d 1014, 1018 (1st Cir. 1979)). As Morrison does not demonstrate that discriminatory conduct forming a basis of her ADA claim occurred after July 26, 1992, we need not decide the -38- Company's further contention that Morrison's claim failed because her purported disability did not meet the definitional requirements of the Act. There may be merit to this and related substantive contentions, but we do not reach them because Morrison's asserted violation of the ADA occurred prior to July 26, 1992. D. Riley's Individual Liability ____________________________ In footnotes in their briefs, the parties contest whether Riley can be held liable under Count I in his individual capacity for violations of Title VII and the Maine Human Rights Act. We deal separately with the federal and the state aspects of this issue. 1. Individual Liability under Title VII ____________________________________ Title VII defines "employer", in relevant part, as "a person engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such a person." 42 U.S.C. 2000e(b) (West 1994). There is controversy over whether this language allows a corporate supervisor, such as Riley, to be sued as the "agent of such a person." Several circuits have held "No." See, e.g., Tomka ___ ____ _____ v. Seiler Corp., 66 F.3d 1295, 1313-17 (2d Cir. 1995); but ____________ ___ see id. at 1318-24 (Judge Parker's dissenting opinion). The ___ ___ question has no very obvious answer. We decline to answer it here. The district court's ruling that Riley was liable under Title VII for pre-November -39- 21, 1991 sexual harassment (Count I) has little or no actual impact on Riley that we can discern. Neither the Company nor Riley were or can be held answerable in damages for the pre- November 21, 1991 conduct, and it is not apparent that any other available type of federal relief can be applied against Riley notwithstanding the court's determination that he is liable under Title VII. In such circumstances, and given the absence of developed argument by the parties and of a reasoned disposition of this question by the court below, we are not inclined to seize this opportunity to create circuit precedent on this relatively complex issue. 2. Individual Liability under the Maine Human Rights Act _____________________________________________________ In finding Riley liable, together with his employer, under Maine state law for sexual harassment under Count I, the court imposed a $10,000 civil penalty. Authority for the penalty is found in the Maine Human Rights Act. 5 M.R.S.A. 4613(2)(B)(7) (West Supp. 1996). Riley's liability for that penalty is apparently joint and several with the Company's. The state law judgment against Riley, therefore, is not merely academic, as was the adverse Title VII finding, supra. _____ Still, we are disinclined to rule at this time on whether or not Maine law allows individual liability. While arguably the different language of the Maine law more clearly allows individual liability than does Title VII, there is no -40- relevant state court precedent. A federal district court in Maine has construed the law as disallowing individual ___________ liability, relying on the federal precedent that trends that way. Quiron v. L.N. Violette Co. Inc., 897 F. Supp. 18, 20- ______ ______________________ 21 (D. Me. 1995). Appellants' objection to allowing individual recovery here was not set out in the statement of issues in their brief, and consists of one sentence in a footnote, together with a citation to Quiron and a subsequent ______ case. We have said that a party owes this court "developed argumentation." United States v. Caraballo-Cruz, 52 F.3d ______________ ______________ 390, 393 (1st Cir. 1995); cf. Kost v. Kozakiewicz, 1 F.3d __ ____ ___________ 176, 182 (3d Cir. 1993) (casual mention in footnote, without citation, not enough). See Wright, Miller, Cooper and ___ Gressman, Federal Practice and Procedure, Vol. 16, 3974, ________________________________ n.1 (West 1977 & Supp. 1996). The district court itself did not have occasion to discuss the issue, although appellee concedes that defendants raised it in one of their trial motions. Riley is represented by the same attorneys as the Company and, for all that appears, may never be required by his employer to share personally in the payment of the $10,000 penalty. Under these circumstances, we think the most satisfactory way to handle the issue is to vacate the individual judgment against Riley under Count I and remand with instructions that, if either party wishes, the court -41- shall reopen, and expressly rule upon, the issue of whether the Maine Human Rights Act provides for individual liability. In so doing, the court may, in its discretion, certify the question to the Supreme Judicial Court of Maine. This course will ensure either a reasoned decision or a dispositive ruling by Maine's highest court. It will also enable the parties and the court to drop the matter if, as the parties' casual treatment suggests, it is of no practical interest to them. The legal questions of individual liability under both Title VII and the Maine statute are significant ones. Precisely because this is so, we do not wish to decide them in the fragmented, undeveloped setting in which they appear. V. We affirm the district court's rulings on Counts I and II, except we vacate the finding against Riley under Count I. We reverse the jury's verdicts on Counts I and IV. We vacate the court's amended judgment and remand for further proceedings, and for the entry of a new judgment, not inconsistent with this opinion. Upon remand the district court shall reopen the question of back pay and any other available form of relief that may now be appropriate under the affirmed claims given our reversal of the jury's verdicts under Counts I and IV. The parties shall bear their own costs of appeal.  -42- It is so ordered.  -43-