Luz N. RUIZ, Plaintiff,

v.

CARIBBEAN RESTAURANTS,
INC., Defendant.

No. Civ.97–1612DRD.

United States District Court,
D. Puerto Rico.

June 9, 1999.

## OPINION AND ORDER

DOMINGUEZ, District Judge.

Pending before the Court is Defendant's, Caribbean Restaurants, Inc. ("CRI"), Motion For Summary Judgment (Docket No. 22), which Plaintiff, Luz N. Ruiz ("Ruiz"), opposed (Docket No. 23).[1] For the succeeding reasons, Defendants' Motion For Summary Judgment is hereby **GRANTED IN PART** and **DENIED IN PART.**

## I. BACKGROUND

Consistent with the well-settled standard for summary judgment, the Court reviews the evidence in a light most favorable to Ruiz, and grants to her all reasonable inferences that can be adduced therefrom. *See Barreto–Rivera v. Medina–Vargas,* 168 F.3d 42, 44 (1st Cir.1999). CRI is a corporation which operates in Puerto Rico the fast-food restaurant chain known under the tradename of "Burger King." During Ruiz' employment with CRI, she alleges her supervisor, Rafael Rivera,[2] sexually harassed her. Furthermore, within two months following Ruiz' transfer away from her alleged harasser's supervision, Ruiz claims the sexual harassment culminated in her discharge from CRI. Ruiz filed suit for the following violations: Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; Title VII

---

1. Additionally, the following litany of docket entries were spawned: CRI amended (Docket No. 26), supplemented (Docket No. 34), amended the supplement (Docket No. 40), and provided certified translations for the Motion (Docket No. 31); CRI replied to Ruiz' response (Docket No. 28); Ruiz replied to CRI's reply (Docket No. 36); CRI responded to Ruiz' reply and supplemented the Motion for a second time (Docket No. 37); Ruiz supplemented the original opposition (Docket No. 38), provided certified translations for the opposition (Docket No. 39), and replied to CRI's amended supplement to the Motion (Docket No. 41).

2. Initially, Rafael Rivera was named as a Co-defendant in the Amended Complaint. (Docket No. 2). Rafael Rivera, thereafter, filed a Motion For Judgment On The Pleadings (Docket No. 14), which the Plaintiff responded to by filing a Motion To Dismiss Without Prejudice. (Docket No. 16). Pursuant to the motion by Rafael Rivera and the Plaintiff's response, the Court dismissed the Plaintiff's claims against Rafael Rivera with prejudice. (Docket No. 19).

of the Civil Rights Act of 1991, 42 U.S.C. § 1981a et seq.; Puerto Rico Law 17, 29 L.P.R.A. §§ 155 et. seq. (1988); Puerto Rico Law 100, 29 L.P.R.A. §§ 146 et. seq. (1991); and Article 1802 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 5141 (1956).

Ruiz began working for CRI as a part-time general employee on September 11, 1992. A year later, on September 26, 1993, she was promoted to manager trainee by the Regional Operations Manager, Rafael Rivera.[3] Ruiz worked within Rafael Rivera's region for about the next year and eight months, that is until May 15, 1995. Ruiz was promoted to district assistant manager on December 24, 1993, and as such she began a rotation through restaurants in the region including Plaza Centro, Oriental Plaza, Villa Blanca, and Vista del Río. Plaintiff was assigned to the Vista del Rio location, under the supervision of restaurant manager Maribel Díaz, on December 4, 1994, where Ruiz alleges Rafael Rivera first began to subject her to sexual harassment. By the end of March 1995, Ruiz was transferred to the Villa Blanca restaurant and was supervised by Jorge Rivera. Finally, on April 30, 1995, she was transferred out of Rafael Rivera's region to a region under the supervision of Operations Manager, William Sierra. Ruiz was assigned to the Caguas III (Burger King) restaurant supervised by the restaurant manager Margarita Nieves. While within this newly assigned region, Ruiz was discharged from CRI on July 10, 1995.

Ruiz alleges the harassment by Rafael Rivera consisted of offensive gestures, invitations to engage in sexual relations, and sexually explicit commentaries, wherein Rafael Rivera described his sexual fantasies to her. She contends that the harassment was continuous, unwelcome, and met by rejection. Ruiz further asserts that each rejection was reciprocated by retaliatory measures from Rafael Rivera and other agents of CRI. The retaliatory measures included written reprimands, transfers to different restaurants, suspensions, and finally termination of Ruiz.

During her tenure of employment, Ruiz received nineteen (19) written reprimands. Thirteen (13) written reprimands and three (3) suspensions occurred when Ruiz was under Rafael Rivera's supervision including five (5) reprimands and two (2) one-week suspensions which came directly from Rafael Rivera. She also received deficient evaluations from the unidentified mystery client[4] and from Frank Velázquez of CRI's quality assurance division. After Ruiz' transfer from Rafael Rivera's region and placement into William Sierra's, Ruiz received the remaining six (6) warnings from Margarita Nieves, the restaurant manager for the Caguas III restaurant. Additionally, Ruiz received her fourth and final one-week suspension in the new region under Nieves.

It is undisputed that while Ruiz was still a general employee, she followed CRI's sexual harassment procedures and filed a written complaint with Human Resources Director Manuel Marrero on January 27, 1993, against a restaurant manager Gerardo Díaz. She alleged Díaz had made obscene jokes to her and commented on her buttocks. Ruiz was transferred and Díaz was investigated and subsequently terminated from CRI's employment.

---

**3.** As an Operations Manager, Rafael Rivera was not assigned to any particular restaurant, but instead was required to periodically visit each of the restaurants within the region he supervised.

**4.** The unidentified mystery client is part of a regular, premises evaluation service performed by an unidentified evaluator who simulates being a client. The evaluator assesses, among other matters, the efficiency of the restaurant, the cleanliness, and client relations—such as greetings, smiling at customers, etc. While Ruiz was running the Plaza Centro location, the evaluation fell below the company's required 85% minimum. In response, Rafael Rivera, issued a written warning to Ruiz stating that any subsequent deficient evaluations could result in suspension or discharge.

## II. LOCAL RULE 311.12

### A. Standard

Local Rule 311.2 provides that, "[a]ll motions shall state with particularity the grounds therefor and shall set forth the relief or order sought. Motions shall be accompanied by a brief which shall contain a concise statement of reasons in support of the motion, and citations of authorities upon which the movant relies." [5] Local Rule 311.2. Further, pursuant to Local Rule 311.12, the proponent of a summary judgment motion shall serve and file "annexed to the motion a separate, short, and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried and the basis of such contention as to each material fact, properly supported by specific reference to the record." Local Rule 311.12.

■ "If the respondent opposes a motion, he or she shall file a response within ten (10) days after service of the motion, including brief and such supporting documents as are then available. Briefs shall contain a concise statement of reasons in opposition to the motion, and a citation of authorities upon which the respondent relies." [6] Local Rule 311.5. Additionally, for an opposition to a motion for summary judgment, the movant's statement of contested facts are deemed to be admitted unless the nonmoving party controverts by filing, in addition to motion in opposition and a brief, a "separate, short, and concise statement of the material facts as to which it contends that there exists a genuine issue to be tried, properly supported by specific reference to the record." Local Rule 311.12. "[A] district court [is] entitled to insist upon compliance with its local rule...." *Corey v. Mast Road Grain & Bldg. Materials Co., Inc.*, 738 F.2d 11, 12

(1st Cir.1984); *see also United States v. Proceeds of Sale of 3,888 Pounds Atlantic Sea Scallops*, 857 F.2d 46 (1st Cir.1988).

The Chief Judge of the District, Hector M. Laffitte, recently underscored the importance of this rule in "lay[ing] out the material facts in dispute clearly for a district court that is swamped with an overwhelming number of civil and criminal dispositive motions." *Dominguez v. Eli Lilly & Co.*, 958 F.Supp. 721, 727 (D.P.R.1997). "Without such a rule, the Court would have to search through the record, with or without the assistance of counsel, for lurking evidence of a genuine issue of material fact. Local Rule 311.12 prevents 'the recurrent problem of ferreting through the record and the specter of district judges being unfairly sandbagged by unadvertised factual issues.' " *Id.* (quoting *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 930–31 (1st Cir.1983) (internal citations omitted)). Moreover, "[w]ithout specific references to the Record, the list of uncontested and contested facts does not serve its purpose. The Court would have to continue to ferret through the record, read all the answers to the interrogatories, study all the attached documents, and carefully scrutinize all the depositions for lurking genuine issues of material fact." *Id.* Accordingly, failure to comply with the "anti-ferreting rule" can have severe consequences. Indeed, as *Stepanischen* warns ... that the failure to make specific references to the Record 'would, where appropriate, be grounds for judgment against the party.' " *Dominguez*, 958 F.Supp. at 727 (quoting *Stepanischen*, 722 F.2d at 931).

### B. Noncompliance By Plaintiff

In the instant case, Defendant filed a Statement Of Uncontested Facts, which

---

5. Also under the local rules a "[m]ovant may include in his or her motion the concise statement of reasons in support of the motion, and citation of authorities upon which movant relies, instead of filing the separate brief required by the subsection." Local Rule 311.2.

6. Similarly, under the local rules a "[r]espondent may include in his or her opposition the concise statement of reasons in support of the motion, and citation of authorities upon which respondent relies instead of filing the brief required by the subsection." Local Rule 311.5.

comports with Local Rule 311.12 accompanying the Motion For Summary Judgment (Docket No. 22).

█ The Plaintiff, on the other hand, did not file a separate, short, and concise statement of material facts. The Court has searched the entire opposition and has found in the brief under the heading "CONTENTION OF FACTS" what appears to be an attempt to set-forth a statement of contested facts. However, Plaintiff has strewn additional facts, which the Court believes should be proffered as contested facts, throughout the opposition. Local Rule 311.12 specifically warns that the movant's statement of contested facts are deemed to be admitted unless the non-moving party controverts by filing, in addition to a motion in opposition and a brief, "**a separate, short, and concise statement of material facts** as to which it is contended that there exists a genuine issue to be tried, properly supported by specific reference to the record." Local Rule 311.12 (emphasis added). The Court reminded Plaintiff, in the Order Setting Initial Scheduling And Case Management Conference (Docket No. 9, p. 4), that not only is the movant required to file the statement of uncontested facts **as an annex** to the motion for summary judgment, the opposing party **must similarly file** a statement of contested facts in compliance with Local Rule 311.12. Separate means a separate document, not inserted in the opposition brief. None was provided by Plaintiff. Instead, giving the Plaintiff the benefit of the doubt, Plaintiff has inserted its statement of contested facts within the brief. Short, and concise statement of material facts, however, means just that-as opposed to the Plaintiff's statement, which is riddled with arguments, reiterations of Defendant's rendition of the facts, and other superfluous information. Further, the Plaintiff places voluminous references to the record in the support of her arguments. The Court cannot engage in an endless expedition "ferreting through the record" searching for facts favoring Plaintiff looking for the proverbial needle in a haystack. Therefore, the Court finds that a Plaintiff has not filed a Statement Of Contested Facts in compliance with Local Rule 311.12 or the Court's scheduling order. "[A] district court [is] entitled to insist upon compliance with its local rule. . . ." *Corey v. Mast Road Grain & Bldg. Materials Co., Inc.,* 738 F.2d 11, 12 (1st Cir.1984); *see also United States v. Proceeds of Sale of 3,888 Pounds Atlantic Sea Scallops,* 857 F.2d 46 (1st Cir.1988). Consequently, the Court has the discretion to deem Defendant's Statement Of Uncontested Facts admitted. *See Ayala–Gerena v. Bristol Myers–Squibb Co.,* 95 F.3d 86 (1st Cir.1996); *Stepanischen,* 722 F.2d at 930–31; *Dominguez,* 958 F.Supp. at 721. Given the severity of Plaintiff's noncompliance versus the penalty of deeming admitted Defendant's Statement of Uncontested Facts, the Court elects admonishment of Plaintiff and Plaintiff's counsel.[7] The conduct of Plaintiff has caused the Court to waste a considerable amount of time "ferreting through the record."

### III. SUMMARY JUDGMENT STANDARD

The function of summary judgment is "to pierce the boilerplate of the pleadings and examine the parties' proof to determine whether a trial is actually necessary." *Vega–Rodriguez v. Puerto Rico Tel. Co.,* 110 F.3d 174, 178 (1st Cir.1997) (citing *Wynne v. Tufts Univ. Sch. of Med.,* 976 F.2d 791, 794 (1st Cir.1992)). A court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact . . ." Fed.R.Civ.P. 56(c). "To defeat a motion

---

**7.** Plaintiff's counsel is encouraged to thoroughly review the Local Rules promulgated by the District of Puerto Rico. Further, Plaintiff and Plaintiff's counsel are hereby fore-warned that the Court does not take these rules lightly and any further noncompliance will be met with harsh consequences.

for summary judgment, the nonmoving party must demonstrate the existence of a trialworthy issue as to some material fact." *Cortes–Irizarry v. Corporacion Insular,* 111 F.3d 184, 187 (1st Cir.1997). "In applying this formulation, a fact is 'material' if it potentially affects the outcome of the case," *Vega–Rodriguez,* 110 F.3d at 178, and " 'genuine' if a reasonable factfinder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." *Cortes–Irizarry,* 111 F.3d at 187. "Speculation and surmise, even when coupled with effervescent optimism that something definite will materialize further down the line, are impuissant in the face of a properly documented summary judgment motion." *Ayala–Gerena,* 95 F.3d at 95.

"On issues where the nonmovant bears the ultimate burden of proof at trial, he may not defeat a motion for summary judgment by relying on evidence that is 'merely colorable' or 'not significantly probative.' " *Pagano v. Frank,* 983 F.2d 343, 347 (1st Cir.1993) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The nonmovant must "present definite, competent evidence to rebut the motion." *Mesnick v. General Electric Co.,* 950 F.2d 816, 822 (1st Cir.1991), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). "The court may consider any material that would be admissible or usable at trial." *See* 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2721, at 361 (3d ed.1998). "But the court should do no more than this in reviewing the quality of the evidence. Most critically, it must never 'weigh the evidence and determine the truth of the matter. . . .' " *Lipsett v. University of P.R.,* 864 F.2d 881, 895 (1st Cir.1988) (quoting *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511). The court should " 'look at the record . . . in the light most favorable to . . . the party opposing . . . the motion' . . . [and] indulge all inferences favorable to the party opposing the motion." *Hahn v.*

*Sargent,* 523 F.2d 461, 464 (1st Cir.1975) (quoting *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962)) (citations omitted). "If, after this canvassing of the material presented, the district court finds that some genuine factual issue remains in the case, whose resolution one way or another could affect its outcome, the court must deny the motion." *Lipsett,* 864 F.2d at 895 (citing *Anderson,* 477 U.S. at 242, 106 S.Ct. at 2505). "Summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990).

"We believe that summary judgment procedures should be used sparingly . . . where the issues of motive and intent play leading roles . . . It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.' " *Poller v. Columbia Broad. Sys.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Cf Pullman–Standard v. Swint,* 456 U.S. 273, 288–90, 102 S.Ct. 1781, 1790–1791, 72 L.Ed.2d 66 (1982) (discriminatory intent is a factual matter for the trier of fact); *see also William Coll v. PB Diagnostic Systems, Inc.,* 50 F.3d 1115, 1121 (1st Cir.1995); *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 107 (1st Cir.1988); *Lipsett,* 864 F.2d at 895. "Under such circumstances, jury judgments about credibility are typically thought to be of special importance." *Stepanischen,* 722 F.2d at 928. Furthermore, "[n]o credibility assessment may be resolved in favor of the party seeking summary judgment." *Woodman v. Haemonetics Corp.,* 51 F.3d 1087, 1091 (1st Cir.1995) (citations omitted). In a discriminatory discharge case, particularly, a Plaintiff "will rarely, if ever be able to produce a 'smoking gun' that

provides direct, subjective evidence of an employer's [animus]. Rather, a plaintiff must try to convince the fact-finder to draw an inference from a broad array of circumstantial and often conflicting evidence...." *Stepanischen,* 722 F.2d at 929. However, "even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Ayala–Gerena,* 95 F.3d at 95. "But when the plaintiff can point to specific facts detailed in affidavits and depositions—that is, names, dates, incidents, and supporting testimony—giving rise to an inference of discriminatory animus, the dispute must be subjected to the factfinding process." *Lipsett,* 864 F.2d at 895.

## IV. DISCUSSION

▇ Title VII provides that:

"It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex."

42 U.S.C. § 2000e–2(a)(1). Sexual harassment is a form of sex discrimination which Title VII prohibits. *Morrison v. Carleton Woolen Mills, Inc.,* 108 F.3d 429, 436–37 (1st Cir.1997); *Lipsett,* 864 F.2d at 897. Sexual harassment can take on two forms, either *quid pro quo* or hostile work environment.

The EEOC guidelines illuminate the two types of sexual harassment that violate Title VII. "Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, [or] submission to or rejection of such conduct by an individual is used as the basis for employ-

ment decisions affecting such individual ['*quid pro quo*' harassment], or [2] such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment ['hostile environment' harassment]." 29 CFR § 1604.11(a) (1999); *see Morrison,* 108 F.3d at 437; *Chamberlin v. 101 Realty, Inc.,* 915 F.2d 777, 782 (1st Cir.1990). Plaintiff alleges both varieties.

▇ "[T]he Supreme Court has set forth the standard to be applied in cases where either a legitimate or illegitimate motive applies." *Provencher v. CVS Pharmacy, Division of Melville Corp.,* 145 F.3d 5, 9–10 (1st Cir.1998) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Absent direct evidence of discriminatory intent, the *McDonnell Douglas* burden-shifting framework is utilized to allocate and order the burden of production. *Fennell v. First Step Designs, Ltd.,* 83 F.3d 526, 535 (1st Cir.1996); *See McDonnell Douglas Corp.,* 411 U.S. at 802–805, 93 S.Ct. at 1824–1826. First, a Plaintiff must establish a prima facie showing of discrimination. *Id.* Once established, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Id.* "The production of such a nondiscriminatory reason dispels the presumption of improper discrimination generated by the prima facie showing of discrimination." *King v. Town of Hanover,* 116 F.3d 965, 968 (1st Cir.1997) (citing *Mesnick,* 950 F.2d at 827). If the employer is successful, the Plaintiff must be afforded an opportunity to show that the employer's reason was in fact a pretext or sham. *Id.* Throughout the above, the Plaintiff retains the burden of persuasion. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507–12, 113 S.Ct. 2742, 2747–750, 125 L.Ed.2d 407 (1993); *Carey v. Mt. Desert*

*Island Hosp.,* 156 F.3d 31, 34 (1st Cir. 1998).

"This framework, which is essentially a method for ferreting out discriminatory animus where direct evidence of intent is lacking, is inapplicable when the plaintiff can prove discrimination by direct evidence." *Lipsett,* 864 F.2d at 899 (citing *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985)); *see also Ayala–Gerena,* 95 F.3d at 95–6. "In such cases, the plaintiff must prove by direct evidence that unlawful discrimination was a motivating factor in the employment decision. Then, the burden of persuasion (as well as production) shifts to the defendant, who must show 'by a preponderance of the evidence that the same decision would have been made absent the discrimination.'" *Id.* (quoting *Fields v. Clark University,* 817 F.2d 931, 937 (1st Cir.1987)); *see also Ayala–Gerena,* 95 F.3d at 95–6.

## A. QUID PRO QUO

■ " '[Q]uid pro quo' harassment, occurs when a supervisor conditions the granting of an economic or other job benefit upon the receipt of sexual favors from a subordinate, or punishes that subordinate for refusing to comply." *Lipsett,* 864 F.2d at 897. "It is the essence of *quid pro quo* harassment that the employee 'was subject[ed] to unwelcome sexual advances by a supervisor ... and ... her reaction to these advances affected tangible aspects of ... her compensation, terms, conditions, or privileges of employment....' " *Chamberlin,* 915 F.2d at 783 (quoting *Lipsett,* 864 F.2d at 897). "In rebuttal, the defendant may show that the behavior complained of either did not take place or that it did not affect a tangible aspect or the plaintiff's employment...." *Id.*

In the instant case, the Plaintiff has not shown the Court any direct evidence of discriminating intent and thus the Court proceeds with the *McDonnell Douglas* burden-shifting framework. Note, that "[o]n summary judgment, the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus." *Fennell,* 83 F.3d at 535 (citing *Mesnick,* 950 F.2d at 827).

### 1. Prima Facie Case—Quid Pro Quo

■ First, a Plaintiff must establish a prima facie showing of discrimination. *Fennell,* 83 F.3d at 535; *See McDonnell Douglas Corp.,* 411 U.S. at 802–805, 93 S.Ct. at 1824–1826. For Ruiz to establish a prima facie *quid pro quo* harassment claim she must meet a five-part test asking whether: "(1) the plaintiff employee is a member of a protected group; (2) the sexual advances were unwelcome; (3) the harassment was sexually motivated; (4) the employee's reaction to the supervisor's advances affected a tangible aspect of her employment; and (5) respondeat superior liability has been established." *Chamberlin,* 915 F.2d at 783 (citations omitted).

The *First* element [8] is met simply because Ruiz is a female and is a member of a protected group. *Id.* at 784.

For the Second element's fulfillment, Ruiz rejected Rafael Rivera's sexual advances by leaving the room in silence, telling Rafael Rivera that she was a married woman and was not going to have any type of relationship with him, and ignoring him or changing the subject. (Docket No. 23, Exh. 1, Sworn Statement by Luz N. Ruiz, para. 7); *see also e.g.* (Docket No. 39, Exh. 10, Deposition of Luz N. Ruiz, 2nd session,

8. In light of *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), wherein same-sex sexual harassment was declared actionable under Title VII, all people are within the group protected from sexual harassment, rendering the first requirement of the prima facie case unnecessary. Furthermore, the third requirement appears to encompass the fundamental underlying question needed to posed: but for the fact of Plaintiff's sex, Plaintiff would not have been subjected to sexual harassment.

p. 50 ll. 21–25, and p. 51 ll. 1–3;p. 57 ll. 2–3; p. 64 ll. 12–22; p. 65 ll. 2–7; p. 77 ll. 5–7; p. 80 ll. 17, 19–21; p. 88 ll. 22–23; p. 89 ll. 7–15; p. 91 ll. 23–25, and p. 92 ll. 1–7; p. 110 ll. 13–14;). The evidence demonstrating Ruiz' unalterable resistance to all sexual advances is enough to support the Court finding that an inference could be drawn that the alleged advances were uninvited, offensive, and unwanted. *See Id.* at 784 (citing *Lipsett,* 864 F.2d at 898).

To assess the *Third* element, we ask "but for the fact or her sex, the plaintiff would not have been the object of harassment." *See Id.* (quoting *Jones v. Flagship Int'l,* 793 F.2d 714 (5th Cir.1986); *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982) ("In the typical case in which a male supervisor makes sexual overtures to a female worker, it is obvious that the supervisor did not treat male employees in a similar fashion. It will therefore be a simple matter for the plaintiff to prove that but for her sex, she would not have been subjected to sexual harassment.")). Absent any indication that Rafael Rivera treated male employees in a similar manner to Ruiz, the simple conclusion is that except for Ruiz' sex, Rafael Rivera would not have sexually harassed her. *See Id.*

The *Fourth* element requires that the employee's reaction to the sexual harassment must have elicited a reprisal which affected a tangible aspect of her employment. *Id.* at 783. It bears repeating, that in the determination of a motion for summary judgment the Court is to view all evidence in the light most favorable to the nonmovant affording the nonmovant all reasonable inferences that can be drawn from the evidence and refraining from weighing the evidence or making determinations of credibility especially in cases, such as the one at bar, that rely on circumstantial evidence to prove issues of motive and intent. *See Woodman v. Haemonetics Corp.,* 51 F.3d at 1091; *Lipsett,* 864 F.2d at 895; *Stepanischen,* 722 F.2d at 928; *Hahn v. Sargent,* 523 F.2d at 464.

The Plaintiff contends that Rafael Rivera established as a condition for Plaintiff's success in her employment with CRI, that she accept Rafael Rivera's sexual advances. Ruiz alleges CRI through Rafael Rivera and others retaliated against her for the rejections with warnings. suspensions, and transfers. Out of the nineteen (19) written reprimands, thirteen (13) reprimands and three (3) suspensions came during the time interval when Ruiz was under Rafael Rivera's supervision including five (5) reprimands and two (2) one-week suspensions which came directly from Rafael Rivera.

However, Ruiz' discharge was after removal from Rafael Rivera's region. In fact. Ruiz was discharged while within William Sierra's region. While within Sierra's region Ruiz received an additional six (6) warnings and a suspension from the restaurant manager for the Caguas III Burger King, Margarita Nieves. In addition, it was Nieves who initiated Ruiz' termination. After concurrence from Sierra, and then Manuel Marrero, Ruiz was terminated by Nieves on July 10, 1995.

Some evidence marshaled by Ruiz, examining the matter in the light most favorable to the nonmovant, *see Barreto–Rivera v. Medina–Vargas,* 168 F.3d at 44, points to the inference that Sierra was influenced by Rafael Rivera. First, there is Sierra's sworn statement which refers to his meeting with Ruiz when she came to Sierra to appeal her dismissal.

"Initially she complained about her dismissal and denied having a mismanagement of cash. **I had already heard** that Ruiz had a history of mismanagement of cash **that preceded** her performance under my supervision and that of Nieves and reminded her of it. Ruiz then admitted that she had had problems managing cash while working in the region of Rafael Rivera under the supervision of the manager of the restaurant, Jorge Rivera. I reminded her that the same continued to occur with other supervisors, in this case with Margarita Nieves,

and that the pattern had continued despite having given her several opportunities...."

(Docket No. 22, Exh. F, Sworn Statement by William Sierra Lopez, paras. 15). Sierra's statement is then combined with the following statement allegedly made by Rafael Rivera to Ruiz.

"Before the date of my transfer to another territory under the supervision of Mr. William Sierra, he told me 'that I have struggled a lot with you and have not receive anything in return from you ..., I can not continue this fight with you, I am leaving *you* in the hands of Willy as you wished and Willy is going to terminate you ... that has [been] agreed.' He was referring to my refusal to accept his sexual advances."

(Docket No. 23, Exh. 1, Sworn Statement by Luz N. Ruiz, para. 6i) (emphasis added); *see also* (Docket No. 39, Exh. 10, Deposition of Luz N. Ruiz, 2nd session, p. 118 l. 25, and p. 119 ll. 1–4) (Ruiz quoting Rafael Rivera, "I have struggled a lot with **you and I haven't gotten anything from you,** well, I can't deal with you and I'm going **to leave you in, in Willie's hands** like you want, because **Willie is going to fire you, because this is all set.**"); (Docket No. 39. Exh. 10, Deposition of Luz N. Ruiz, 2nd session, p. 160 ll. 19–24) ("Because when Rafael Rivera gave me the transfer he told me: 'I'm going to transfer you with, with Willie because I have no remedy with you any longer, you don't want to make any move in your favor, you don't want to do anything, well I'm going to transfer you with hi (sic), because he's going to fire you and everything is all set.' "). In deposition when queried whether Rafael Rivera's statement referred to Ruiz' work history, Ruiz replied **"Each one of these ..., of, of these comments, after my refusals of the insinuations that I go out with him he always paid me with a suspension, like a warning."** (Docket No. 39, Exh. 10, Deposition of Luz N. Ruiz, 2nd session, p. 119 ll. 12–15). Later, within the same deposition session, Mr. González told Ruiz to " '[p]repare yourself I came to knock down heads, I have an assignment which is to knock down heads with Margarita [Nieves].' ... [and][h]e told me Rafy said that I was shit, he said that I was no good, that they had ..., they had to fire me, that they had to find a way to take me out because I was no good." (Docket No. 39, Exh. 10, Deposition of Luz N. Ruiz, 2nd session, p. 161 ll. 13–14, 23–24, and p. 162 l. 1). The excerpt from Ruiz' sworn statement above coupled with Sierra's concession of prior knowledge of Ruiz' deficient performance and the trial court being required to afford all reasonable inferences in favor of Plaintiff at the summary judgment stage,it could be inferred that Sierra was influenced by Rafael Rivera. Undisputed is the fact that Sierra had direct input and influence over the discharge calculus. Therefore. Ruiz has shown a genuine issue of fact as to her discharge, which is a tangible aspect of employment and summary judgment is improper.

Plaintiff's Opposition brief, states that most of the written reprimands were frivolous, contested by Ruiz within the written warnings, and explained in her deposition. Ruiz' sworn statement in pertinent part provides:

"That Mr. Rivera threatened me and made it very clear that if I was not responding to his sexual advances or laugh at his jokes he could make my life miserable. I got lots of warnings, most of them without any corroboration of the facts, or for things that I did not do. Some were given by him, others by his supervisors, but I know that all of them were ordered by him. I also got transferred to restaurants that were distant from my home and I knew by his comments that it was his doing, not because of my performance but because as he said in several occasions 'I was not cooperating', and by the look in his face I knew he was referring to sex. He also visited the restaurants where I was assigned too often."

(Docket No. 23, Exh. 1, Sworn Statement by Luz N. Ruiz, para. 9). Furthermore, from Ruiz' deposition, "Because he would tell me: **'I'm suspending you because of this and this, but look dear, if you would accept none of this would happen.'**" (Docket No. 39, Exh. 10, Deposition of Luz N. Ruiz, 2nd session, p. 152 l. 25 and p. 153 ll. 1–2). And, " '[i]f you would allow yourself to be taken or, accept all of this is over.' What is he telling me: '[i]f you go out with me the memos, the suspensions are over.' " (Docket No. 39, Exh. 10, Deposition of Luz N. Ruiz, 2nd session, p. 157 ll. 11–14).

Another argument by Ruiz, in her attempt to defeat summary judgment, is "manipulation" by Rafael Rivera of the supervisors within his region. (Docket No. 39, Exh. 10, Deposition of Luz N. Ruiz, 2nd session, p. 153). The evidence to support the allegation of "manipulation" is an alleged statement made to Ruiz by José Canino Santiago. "Look Luz [Ruiz], I have to congratulate you because you have to improve in some areas, right, but don't get tense, that is, do what you know because you do it very well. And I don't know how [Rafael Rivera] talked to us about so many things and made us do so many things against you, because you really work well." *Id.* at pp. 153–54; *see also Id.* at p. 119. Although the statement has some apparent inadequacies (e.g., were reprimands one of the things Rafael Rivera made us do), the Court granting all reasonable inferences to Plaintiff, takes the statement at face value. Nowhere does Ruiz specifically address either reprimand and on the face of the reprimands themselves, Ruiz **agreed** with both reprimands.[9] *See* (Docket No. 22, Exh. B, Deposition of Luz N. Ruiz, 1st session, Exhs. 25 & 26). Nonetheless, inferring in favor

of Ruiz, the Court assumes that one of the "so many things against [Ruiz]" did include the two reprimands given by the declarant, Canino. The Court finds, granting every reasonable inference in her benefit and in spite of Ruiz' apparent acquiescence as to the validity of Canino's reprimands and absence of contention thereto, that these two reprimands create a genuine issue of fact as to whether Rafael Rivera determined and/or was behind them. And if so, was sexual harassment his underlying impetus. Therefore, the Court must deny summary judgment.

Along the same line of analysis, Ruiz further states, "Yes, no, it's that is not like that. Because Rafy [Rafael Rivera] authorized someone to suspend me and I would be suspended. Rafy would say that I be given a warning and they did and would tell me: 'Look, I'm giving you this warning, Mr. Rafy made me give it to you.' In all occasions, in all, in all." (Docket No. 39, Exh. 10, Deposition of Luz N. Ruiz, 2nd session, p. 160 ll. 1–6).

Lastly, the Court has reviewed the five (5) written reprimands given directly from Rafael Rivera. The Court finds that although given that the reprimands on their face show legitimate nondiscriminatory reasons for the reprimands, and in spite of the absence of any specific objections to the their validity, the Plaintiff by the evidence outlined above has created a genuine issues of fact as to the reprimands' propriety.

The Court is keenly aware that when motive and intent enter into the picture summary judgment is sparingly used and issues of credibility can not be resolved in favor of the movant. *See e.g. Poller v. Columbia Broad. Sys.*, 368 U.S. at 473, 82 S.Ct. at 491; *Woodman v. Hae-*

9. CRI's reprimand forms, titled "Employee Orientation Report," contains a section for the "Employee's Position." In that section there is one box with these words next to it "I agree with the company's decision," and directly below the first box is another box with these words next to it "I disagree with the

company's decision." For both of the written reprimands the first box indicating Ruiz' agreement with the company's decision was marked with an "X". Ruiz also signed the form and made no comments in the space provided therefor.

*monetics Corp.,* 51 F.3d at 1091. However- er, "even in cases where elusive concepts such as motive or intent are at issue, sum- mary judgment may be appropriate if the nonmoving party rests merely upon con- clusory allegations, improbable inferences, and unsupported speculation." *Ayala– Gerena,* 95 F.3d at 95. "But when the plaintiff can point to specific facts detailed in affidavits and depositions-that is, names, dates, incidents, and supporting testimony- giving rise to an inference of discriminato- ry animus, the dispute must be subjected to the factfinding process." *Lipsett,* 864 F.2d at 895.

To present a prima facie case of *quid pro quo* discrimination a Plaintiff must es- tablish that the employee's reaction to the sexual harassment elicited a reprisal which affected a tangible aspect of her employ- ment. *Chamberlin,* 915 F.2d at 783. Ruiz does proffer evidence, giving her all rea- sonable inferences, that her discharge de- cision by Sierra was infected by discrimi- natory animus. Likewise, although the reprimands with accompanying suspen- sions and transfers on their face demon- strate nondiscriminatory reasons for issu- ance, from the evidence recounted above, and stretching inferences to the furthest elasticity, the Court could draw the infer- ence that Rafael Rivera affected a tangible aspect of Ruiz' employment for rejecting his sexual advances. *See Id.* Therefore, the Court holds that Ruiz has satisfied the fourth requirement of *quid pro quo* prima facie case.

The appropriate query for the *Fifth* ele- ment, is whether a respondeat superior relationship existed. "An employer is strictly liable for the actions of its supervi- sors that amount to sexual discrimination or sexual harassment resulting in tangible job detriment to the subordinate employ- ee." *Id.* at 785 (quoting *Henson v. City of Dundee,* 682 F.2d at 910). The instant case involves supervisor to subordinate sexual discrimination. The fourth re- quirement of the prima facie case if met will automatically impose respondeat supe- rior liability in a case where a adverse employment action is taken. Because the outcome of fourth requirement is determi- native and that requirement has been ful- filled the prima facie case has been met.

### 2. *Legitimate, Nondiscriminatory Reasons*

■ Once a prima facie showing has been established, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Fennell,* 83 F.3d at 535; *See McDonnell Douglas Corp. v. Green,* 411 U.S. at 802–805, 93 S.Ct. at 1824–1826. "The production of such a nondiscriminatory reason dispels the presumption of improper discrimina- tion generated by the prima facie showing of discrimination." *King v. Town of Han- over,* 116 F.3d at 968 (citing *Mesnick* 950 F.2d at 827). Throughout the above, the Plaintiff retains the burden of persuasion. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. at 507–12, 113 S.Ct. at 2747–750; *Carey v. Mt. Desert Island Hosp.,* 156 F.3d at 34.

■ First, CRI states that at the time of discharge, Ruiz worked under Nieves within a region supervised by Sierra. Thus, Ruiz was outside of Rafael Rivera's region, and hence his supervision and au- thority. The discharge was initiated by Nieves. Prior to the discharge incident, Nieves had already given Ruiz five repri- mands including a one week suspension.

Ruiz does not controvert or address Nieves' version of the facts. Additionally, Ruiz does not contend that she informed Nieves of the alleged sexual harassment. Nieves, in her sworn statement delineates the facts supporting the six (6) written reprimands and one-week suspension giv- en to Ruiz in this new region, including the discharge incident. (Docket No. 22, Exh. D, Sworn Statement by Margarita Nieves Martinez, paras. 4–8, attachments 1–6). The highlights are described. On June 7, 1995, Nieves gave Ruiz a third written reprimand along with a one-week suspen- sion for, among other things, a shortage of

$18.00. *Id.* at para. 6, attachment 4. The suspension was made after consultation with William Sierra and Manuel Marrero, Human Resources Director. *Id.* at para. 6. Shortly thereafter, Nieves again admonished Ruiz this time for mismanagement of cash because of a $52.00 short. *Id.* at para. 7, attachment 5. The sixth infraction, on July 8, was due to a $70.00 shortage. *Id.* at para. 8, attachment 6. Nieves personally verified the shortfall with Ruiz. *Id.* Nieves called Sierra. After consultation Nieves and Sierra agreed that dismissal was proper. Nieves then brought the matter to Manuel Marrero's attention, who was in agreement with Nieves' and Sierra's decision and Marrero indicated that Nieves should proceed to terminate Ruiz. *Id.* at para. 10. Ruiz was dismissed on July 10, 1995. *Id.* at para. 11.

Ruiz does not specifically address or contradict Sierra's rendition of the events surrounding her discharge. Sierra, also recounted Ruiz performance deficiencies and his concurrence with Nieves after the $70.00 shortage, to fire Ruiz. (Docket No. 22, Exh. F, Sworn Statement by William Sierra Lopez, paras. 5, 8–13). Subsequent to Sierra's agreement with Nieves, Sierra consulted with Marrero. *Id.* at para. 12. After explaining the situation to Marrero, Sierra states that Marrero was in agreement with the discharge decision. *Id.* Sierra then gave Nieves the go-ahead to discharge Ruiz. *Id.* at para. 13. Ruiz came to Sierra to appeal her dismissal. Thereafter, Sierra reviewed Ruiz employee file and affirmed her dismissal. *Id.* at para. 15–6. Ruiz does not deny that she did not inform Sierra that Rafael Rivera was sexually harassing her.

Aside from the allegation that Ruiz informed Marrero of problems she was having working under Rafael Rivera's supervision, Ruiz does not contend or specifically confront the facts in Marrero's statement. Marrero corroborates the statements provided by Nieves and Sierra. (Docket No. 22, Exh. A, Sworn Statement by Manuel D. Marrero Mi-

randa, paras. 15–19). According to Marrero's statement, he must be consulted before restaurant and operations managers implement a suspension or a termination. *Id.* at para. 2. He was aware Ruiz was having performance problems. *Id.* at para. 13. In fact, on March 10, 1995, he participated in a meeting with Rafael Rivera, Ruiz, Villa Blanca restaurant manager, Jorge Rivera, and submanager, Noralee Camacho, at which numerous deficiencies on Ruiz' part were discussed. At that meeting, Ruiz was warned that if her performance did not improve she would be terminated. After learning of the $70.00 shortfall from Nieves and then Sierra, Marrero examined Ruiz' personnel file, found a consistent record of deficient performance and determined termination was proper. *Id.* at paras. 17–19.

Nieves initiated Plaintiff's discharge. While working for Nieves, Ruiz had a consistent pattern of poor job performance resulting in five written warnings and a one-week suspension before the discharge incident. Before termination, Ruiz had been warned twice for cash shortages. Ruiz was then discharged upon her third strike of cash shortages, that last time for a $70.00 shortage. Plaintiff has not shown that Nieves was aware of the alleged sexual harassment. Notwithstanding that there exists a genuine issue of fact as to whether Sierra had been influenced by Rafael Rivera on the discharge decision, the above evidence proffered by CRI brings the Court to the only reasonable conclusion subject to a showing of pretext or sham—that CRI possessed a legitimate nondiscriminatory reason for the termination of Ruiz. To the written reprimands, suspensions, and transfers the Court now turns.

None of the nineteen (19) written reprimands (Docket No. 22, Exh. A, Sworn Statement by Manuel D. Marrero Miranda, attachments 11–28, and Exh. D, Sworn Statement by Margarita Nieves Martinez, attachment 6), are specifically

addressed by Ruiz. Instead, Ruiz relies on her objections written on the reprimands to speak for themselves.

The Court first addresses the eight (8) reprimands that Ruiz received while within Rafael Rivera's region but not penned by him. After meticulous review of those eight (8) written reprimands, the Court finds that given the reprimands on their face provide legitimate nondiscriminatory reasons for the reprimands. Further, the absence of any specific objections to the their validity, and the ad hoc sworn statements supporting the reprimands, militates the Court to conclude the reprimands with accompanying suspensions and transfers are nondiscriminatory and for legitimate business reasons. Therefore, the Plaintiff has not created a genuine issue of fact as to those eight (8) reprimands' propriety.

Lastly, the five (5) reprimands penned by Rafael Rivera are addressed. The first reprimand on February 25, 1994, in Ruiz' own words, was due to discrepancies in "voids" [10] that Jorge Rivera attributed to Ruiz because she was the manager in charge when the voids issued and thus responsible. Jorge Rivera reported the incident to Rafael Rivera. Correspondingly, Rafael Rivera disbursed the reprimand including a one-week suspension. (Docket No. 22, Exh. B, Deposition of Luz N. Ruiz. 1st session, pp. 89–95, Exh. 19); *see also* (Docket No. 22, Exh. A, Sworn Statement by Manuel D. Marrero Miranda, attachment 11). On the face of the reprimand Ruiz agreed with the reprimand. *See Id.; see also* Footnote 7 herein.

The next reprimand by Rafael Rivera on June 30, 1994, again in Ruiz' words, was precipitated by an evaluation by the unidentified mysterious client (described at footnote 2 supra), which fell below the acceptable 85% minimum range set by CRI. Ruiz acknowledged that she was the manager responsible during the time the evaluation had taken place, signed the memorandum, and did not contest the memorandum at the time of issuance or later at her deposition. The memorandum explicitly warns Ruiz that upon reoccurrence she could be suspended or separated from her employment. (Docket No. 22, Exh. B, Deposition of Luz N. Ruiz, 1st session, pp. 121–124, Exh. 27); *see also* (Docket No. 22, Exh. A, Sworn Statement by Manuel D. Marrero Miranda, attachment 16).

Then on February 20, 1995, Ruiz was again reprimanded because the evaluation by the mysterious guest during a surprise visit in January 1995, found that the restaurant was giving deficient service while Ruiz was managing. This warning advises Ruiz, given her negative background in prior visits, "that if like or similar situation is repeated you shall be definitely separated from your employment." (Docket No. 22, Exh. A, Sworn Statement by Manuel D. Marrero Miranda, attachment 18).

Within two weeks, on March 1, 1995, on reports from an employee, relayed to Rafael Rivera by the restaurant manager Maribel Diaz Castillo, that Ruiz had abandoned the restaurant she was supposed to be managing, Ruiz was reprimanded and suspended for one week. Restaurant manager Maribel Diaz Castillo provided confirmation. (Docket No. 22, Exh. A, Sworn Statement by Maribel Diaz Castillo, paras. 5–7). However, the Ruiz' suspension was revoked by Rafael Rivera when the employee recanted her story. (Docket No. 22. Exh. B, Deposition of Luz N. Ruiz, 1st session, pp. 134–143, Exh. 29); *see also* (Docket No. 22. Exh. A, Sworn Statement by Manuel D. Marrero Miranda, attachment 19). Accordingly, this reprimand

10. A "void" is the document that registers when a client rejects an order. The manager in charge must approve it by writing on the void the reason for issuing it and then sign the void. This procedure ensures that voids are not used to hide cash management irregularities. Neglecting the void procedures can result in cash discrepancies at the time of balancing and reconciling the restaurant's monies. *See* (Docket No. 22, Exh. B, Deposition of Luz N. Ruiz, 1st session, pp. 91, 93).

cannot be used as a basis for a legitimate business reason by CRI.

The fifth and final entry by Rafael Rivera coincided with a meeting called for the purpose of discussing Ruiz performance and transfer. The attendees included Rafael Rivera, Ruiz, Jorge Rivera, Nora Lee Camacho and Manuel Marrero. Again interpreting the events from Ruiz' standpoint, the meeting consisted of reading the prepared minutes and for Ruiz to sign it with witnesses. Ruiz states that the minutes "is a summary of everything that we had done, because what he did was take my file and summarize it here." However, the minutes contains, *inter alia*, an admonishment "that in all the restaurants where you have worked the employees have complained of your husband's intervention with them giving them instructions and carrying a weapon ... and that under no circumstances may your husband be inside the facilities of the restaurant, much less giving orders to our employees." Ruiz acknowledges that her husband had, in fact, intervened in her job on one occasion when the restaurant had been robbed. Further, the minutes reflect the transfer was given to Ruiz to afford her a last opportunity to improve her performance. (Docket No. 22, Exh. B, Deposition of Luz N. Ruiz, 1st, session, pp. 144,145, 147, 149, 150, Exh. 30); (Docket No. 22, Exh. G, Deposition of Luz N. Ruiz, 2nd session, p. 143); *see also* (Docket No. 22, Exh. A, Sworn Statement by Manuel D. Marrero Miranda, para. 14, attachment 20).

After reviewing the five (5) written reprimands authored by Rafael Rivera, the Court similarly finds that the reprimands on their face show legitimate nondiscriminatory reasons for the disciplinary actions. That is, with the exception of the March 1, 1995 reprimand, which was revoked and as such must be discarded. The Court therefore finds that the Plaintiff has not created any genuine issues of fact as to the propriety of the reprimands issued by Rafael Rivera.

From the well-documented evidence recounted above, regarding the adverse employment decisions which affected Ruiz, CRI has fulfilled its burden of production and articulated valid, nondiscriminatory reasons. *See Medina–Munoz*, 896 F.2d at 9 ("The burden of persuasion remains with the employee, but the burden of production shifts to the employer, who must then articulate-not necessarily prove-some valid, nondiscriminatory reason for dismissal."). CRI submitted affidavits from the individuals involved in Ruiz' discharge, that is from Nieves, Sierra, and Marrero. In addition, CRI included various other affidavits of CRI employees on an ad hoc basis. None of the affidavits were contested, and each stated that Rafael Rivera did not influence or dictate their decisions. Ruiz was cashiered because of her deficient performance. In the instant case, the Court finds "that this detail goes beyond that required to sustain [CRI's] burden of articulating a nondiscriminatory purpose." *Morgan*, 901 F.2d at 190. Accordingly, the Court holds that even if Ruiz had satisfied the *quid pro quo* prima facie case, CRI has successfully dispelled that showing by articulating legitimate nondiscriminatory reasons for the employment decisions regarding Ruiz. *See Medina–Munoz*, 896 F.2d at 9; *see also Morgan*, 901 F.2d at 190–191.

### 3. Pretext or Sham

In response to Ruiz establishing her prima facie case, CRI has nullified it by articulating valid nondiscriminatory reasons for the actions taken against Ruiz. Ruiz is still able to escape summary judgment if she can show the reasons articulated by CRI were but a pretext or sham for the employer's real motive of sexual discrimination. *See e.g. Medina–Munoz*, 896 F.2d at 9.

If the employer successfully articulates some legitimate, nondiscriminatory reason for the adverse employment action, the Plaintiff must be afforded an opportunity to show that the employer's reason was in

fact a pretext or sham. *King v. Town of Hanover,* 116 F.3d at 968 (citing *Mesnick,* 950 F.2d at 827).

"In this final round of shifting burdens, it is up to the plaintiff, unassisted by the original presumption, to show that the employer's stated reason 'was but a pretext for [sexual] discrimination.' ... To achieve this plateau, [a sex discrimination] plaintiff must do more than simply refute or cast doubt on the company's rationale for the adverse action. The plaintiff must also show a discriminatory animus based on [sex].... Generally speaking, the principles discussed above abide at the summary judgment stage. Most pertinent for our purposes, it remains true that when, as here, the employer has articulated a presumptively legitimate reason for discharging an employee, the latter must elucidate specific facts which would enable a jury to find that the reason given was not only a sham, but a sham intended to cover up the employer' real motive: [sex] discrimination."

*Medina–Munoz,* 896 F.2d at 9 (citations omitted); *Morgan,* 901 F.2d at 191 (Contesting the factual underpinning or objective veracity of reasons for the employment decision "by the employer is insufficient, without more to present a jury question."). Thus Ruiz "must introduce sufficient evidence to support two findings: (1) that the employer's articulated reason for [the adverse employment action against] the plaintiff is a pretext, and (2) that the true reason is discriminatory." *Mulero–Rodriguez v. Ponte, Inc.,* 98 F.3d 670, 674 (1st Cir. 1996) (quoting *Udo v. Tomes,* 54 F.3d 9, 13 (1st Cir.1995)). As previously stated, the Plaintiff retains the burden of persuasion throughout the entire proceedings. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. at 507–12, 113 S.Ct. at 2747–750; *Carey v. Mt. Desert Island Hosp.,* 156 F.3d at 31.

"[T]he issue [of pretext] is not whether [CRI's] reasons to fire [Ruiz] were real,

but merely whether the decisionmakers [ ] believed them to be real." *Mulero–Rodriguez,* 98 F.3d at 674. "The First Circuit has stated repeatedly that Courts will not assume the role of super personnel departments to assess the merits or even the rationality of non discriminatory business reasons." *Maldonado–Maldonado v. Pantasia Mfg. Corp.,* 983 F.Supp. 58, 65 (D.P.R.1997) (citations omitted).

The Court revisits the evidence proffered by the Plaintiff. Aside from the evidence that the Court has previously assessed in the discussions of the prima facie case and CRI's legitimate nondiscriminatory reasons, the Plaintiff points to nothing new that bears on the issue of pretext. In view of the extensive discussions of that evidence, after all inferences are draw in Ruiz' favor, the Court finds Ruiz has created a genuine issue of fact whether CRI's adverse actions against her were in fact a pretext for sexual discrimination. For example, within the prima facie case analysis—the discussions of the nineteen (19) written reprimands, Ruiz' discharge decision which might have been tainted by discriminatory animus, and the alleged "manipulation" by Rafael Rivera of the supervisors within his region. The Court finds that "the evidence as a whole ... infer[s] that the employer's decision was motivated by [sex discrimination] animus." *Maldonado–Maldonado,* 983 F.Supp. at 65 (quoting *Hidalgo v. Overseas Condado Ins. Agencies, Inc.,* 120 F.3d 328, 335 (1st Cir. 1997)). For Ruiz' *quid pro quo* cause of action summary judgment is **DENIED.**

## B. RETALIATION

Again, absent direct evidence of discriminating intent the Court must employ the *McDonnell Douglas* burden-shifting framework. *Fennell,* 83 F.3d at 535; *see also Ayala–Gerena,* 95 F.3d at 95–6.

### 1. Prima Facie Case—Retaliation

As a first step, the Plaintiff must establish a prima facie showing of discrimination. *Fennell,* 83 F.3d at 535; *See*

*McDonnell Douglas Corp. v. Green*, 411 U.S. at 802–805, 93 S.Ct. at 1824–1826. Succinctly:

> "In order to state a *prima facie* case, the plaintiff must show (1) that [s]he engaged in an activity protected under Title VII or engaged in protected opposition to an activity, which participation or opposition was known by the employer; (2) one or more employment actions disadvantaging [her]; and (3) a causal connection between the protected activity and the employment action. *See Hoeppner v. Crotched Mountain Rehabilitation Center*, 31 F.3d 9, 14 (1st Cir. 1994); *Petitti v. New England Tel. & Tel. Co.*, 909 F.2d 28, 33 (1st Cir.1990)."

*King v. Town of Hanover*, 116 F.3d at 968. The Court deems pertinent to reiterate that "[o]n summary judgment, the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus." *Fennell*, 83 F.3d at 535 (citing *Mesnick*, 950 F.2d at 827). The "plaintiff's prima facie burden is not onerous." *Fennell*, 83 F.3d at 535. However, it is "clear that liability should be imposed only if discrimination was **the determinative factor.**" *Provencher v. CVS Pharmacy, Division of Melville Corp.*, 145 F.3d 5, 10 (1st Cir.1998).

■ Approaching this retaliatory discharge claim, the *First* requirement queries whether the Plaintiff reported the alleged sexual harassment. The Court finds that she did not. Admittedly, Ruiz did not file a written sexual harassment claim against Rafael Rivera. Second, Ruiz does not point to any evidence whatsoever indicating that CRI management designated to address sexual harassment complaints, Director of Human Resources, Manuel D. Marrero Miranda, and Administration Director, Vivian Ruiz, knew or had reason to know of the alleged transgressions by Rafael Rivera. Next, Ruiz similarly has presented no evidence indicating CRI's Appeals Committee, which adjudicated her appeal of dismissal, comprised of the Administration Director, Vivian Ruiz, and the Vice–President, Director of Operations, Aniceto Solares, knew or should have known. On the contrary, Ruiz concedes that she never informed or presented her complaint of the sexual harassment by Rafael Rivera to anyone at CRI.

> "Q But besides the ones you mentioned to me so far, do you recall … did it ever happen that you had uhm, that you told anyone at the company that, in fact, that you presented your complaint against Mr. Rivera at any time? Don't talk to me about attempts, because you have already talked to me about unsuccessful attempts. Give me … talk to me about a successful attempt, if any.
>
> A All attempts were unsuccessful."

(Docket No. 39, Exh. 11, Deposition of Luz N. Ruiz, 3rd session, pp. 23–24). The Court finds this admission to be devastating to the first element of Plaintiff's prima facie case. CRI lacked actual knowledge of Ruiz' report of sexual harassment. The Court continues to examine the assertion by Ruiz that although her attempts to inform CRI proved fruitless, CRI was somehow still aware of the harassment.

Notably, the seven (7) letters sent by Ruiz to CRI management before (and after) her discharge never mention nor allude to sexual harassment by Rafael Rivera. (Docket No. 22, Exh. A, Sworn Statement by Manuel D. Marrero Miranda, para. 22 and attachments 3, 29–34); (Docket No. 22, Statement of Uncontested Facts, para. 50); *See also e.g.* (Docket No. 22, Exh. G, Deposition of Luz N. Ruiz, 2nd session, p. 163, ll. 16–19) ("Q. When you appealed the decision of your dismissal you did not mention anything that you believed that it was due to the alleged refusal of the approaches. A. I did not do it in writing."). In fact, from the evidence presented CRI was not aware of Ruiz' allegation of sexual harassment until December 1995, nearly five months after Ruiz

was cashiered. Therefore, the persons to whom the seven (7) letters were addressed could not have discerned from the letters, giving all inferences in favor of Plaintiff, that Plaintiff was being harassed sexually or that Rafael Rivera was the perpetrator. *See e.g. Long v. Tillotson Health Care Corp.*, 968 F.Supp. 751, 754 (D.N.H.1997) (when plaintiff complained of nondiscriminatory conduct, the employer was not required to be a mind-reader before avoiding liability under Title VII for hostile environment sex discrimination).

Even more telling, as mentioned above, Ruiz had previously lodged a sexual harassment complaint against Gerardo Díaz, precipitating in Díaz' discharge and Ruiz' transfer. Irrefutably Ruiz was aware of CRI's sexual harassment policy, the appropriate procedures to file a complaint, and that CRI's response to sexual harassment allegations were swift and decisive. However, Ruiz did not avail herself of the policy's protection by following the proper procedures and reporting Rafael Rivera's conduct.

Ruiz relies upon admittedly unsuccessful attempts to inform CRI of the alleged harassment, insinuating that CRI knew of the harassment. Ruiz provides statements that she made to CRI management in her attempts to illustrate this. For example, Ruiz in pertinent part of her sworn statement avers:

"In one of those occasions in which I went to Central Office Mr. Marrero was present he came out of a meeting and he told me he did not have much time and I told him that I needed a meeting with him and Mr. Solares to explain the problems I was having with Mr. Rivera, that I didn't like his comments and the attitudes he had towards me and that I was having problems because I was rejecting that conduct. That I requested a meeting in private to explain what was happening; he told me that he was going to investigate the case that I should wait that he would call, he never called.... When Rivera told me that I had com-

plained to Marrero I got scared and did not try any further contact with Mr. Marrero.... I tried to contact Mr. Solares, ... I even met him on the sidewalk and I told him that I was having problems with Mr. Rivera, problems that he should know about and that were affecting my employment. There were other people present so I request[ed] (sic) a private meeting and he told me that he could not meet with me at that moment but he took me to his secretary and she told me that at that moment she did not have any dates available, that she would call me to give me a date and she never called me back."

(Docket No. 23, Exh. 1, Sworn Statement by Luz N. Ruiz, para. 8). Conspicuously absent from Ruiz' statement is any specific reference to harassment and in particular sexual harassment. Ruiz contends that she explained to Marrero that she was experiencing problems with Rafael Rivera, his comments, his attitudes towards her, and that she was having problems because she was rejecting that conduct. (Docket No. 23, Exh. 1, Sworn Statement by Luz N. Ruiz, para. 8). However, in her deposition testimony "I'm going to say, Mr. Marrero, that once I, I tried to approach him telling him I had problems, I wanted to comment my situation to him, and since you tell me that you cannot understand me, he can't either, possibly he didn't understand me, and that's where my problem began mostly." (Docket No. 39, Exh. 10, Deposition of Luz N. Ruiz, 2nd session, p. 107, ll. 10–15). And again later, "I was able to tell him that I had problems with Mr. Rafael Rivera, that I didn't like his conduct. Q No, what I'm referring to is that you did not explain in detail anything about the conduct of Mr. Rivera. A It's that there, it's that there was no time and when there was time there were people around, that I cannot speak freely, openly." (Docket No. 39, Exh. 11, Deposition of Luz N. Ruiz, 3rd session, p. 13, ll. 7–13).

From a reading of Ruiz' statement above, which does not even give a hint of

sexual harassment by Rafael Rivera, Marrero, as well as this Court giving all inferences to Plaintiff, could only interpret her statement to mean she was having problems with job performance under Rafael Rivera that had nothing to do with sexual harassment. The water is further muddied by Ruiz' concessions in her deposition testimony which was taken prior to her sworn statement (e.g. that she "tried to approach" Marrero, that "possibly he didn't understand me," etc.). Marrero specifically refutes any knowledge of the alleged harassment prior to December 1995, well after the date of Ruiz' termination, July 10, 1995. Ruiz does not challenge Marrero's statement. Nowhere does she state that Marrero was aware of the harassment. In her deposition testimony Ruiz states that she never spoke to Marrero on the phone. (Docket No. 39, Exh. 11, Deposition of Luz N. Ruiz, 3rd session, p. 12, ll. 11–13). Without explanation, Ruiz cannot, in a subsequent sworn statement, say that she did talk to Marrero on the phone. (Docket No. 23, Exh. 1, Sworn Statement by Luz N. Ruiz, para. 8); *See Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4–5 (1st Cir.1994) ("interested witness . . . cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation or why the testimony is changed."). In short, Ruiz did not inform Marrero that Rafael Rivera was sexually harassing her.

Parallel with the statements made to Marrero by Ruiz, those directed to Solares, are for the same reasons similarly flawed. Likewise, Ruiz did not inform Solares.

Ruiz also stated in her deposition testimony that "I tried to reach Mrs. Vivian Ruiz, . . . and she could never see me." (Docket No. 39, Exh. 10, Deposition of Luz N. Ruiz, 2nd session, p. 107). Vivian Ruiz was also uninformed as to Rafael Rivera's harassment.

The sworn statement of Yesenia Marquez does not aid Plaintiff. On one occasion, Yesenia Marquez went to the "Main Office with Ruiz because she wanted to complained (sic) about Mr. Rivera's sexually harassment." However, she did not accompany Ruiz into the office. (Docket No. 23, Exh. 1, Sworn Statement by Yesenia Marquez, para. 10). Marquez has no personnel knowledge of the events that transpired therein. Consequently, Marquez' statement adds nothing to this discussion.

It bears repeating, that within Ruiz' previous deposition testimony there is an admission by Ruiz that she could not say that the other managers had any knowledge that she was being sexually harassed by Rafael Rivera and she did not inform them of it.

"Q. What you are saying, then, or you believe that those other managers knew about the frustrated advances that Mr. Rivera was making to you.

A. I really can't say that they had any knowledge, because as I told you, Mr. Crespo approached me and told me. In other words, I can think that many of them also saw it and had knowledge of it, not because he told them, but because they observed situations.

Q. But, you never told any of them about it.

A. No, why would I tell them . . . ."

(Docket No. 22, Exh. G, Deposition of Luz N. Ruiz, 2nd session, p. 156, ll. 6–17). This is not the dispositive point, but it does demonstrate that on the record as a whole Ruiz failed to report the harassment.

"In order to survive summary judgment, the plaintiff must point to evidence in the record that would permit a rational factfinder to conclude that the employment action was retaliatory." *King v. Town of Hanover*, 116 F.3d at 968. Simply put, Ruiz has not carried her burden. The Court is not bound to "grant credence to 'conclusory allegations, improbable inferences, and unsupported allegations.'" *Id.* (quoting *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990)).

Wherefore, the Court holds that after affording all inferences that can be educed from the record, the Plaintiff did not engage in an activity protected by Title VII or protected opposition to an activity. Ruiz has failed to establish the first element of her prima facie case and hence, summary judgment is proper.

Given all the reprimands, suspensions, transfers, and finally discharge of Ruiz, the Court believes a fact question exists with regard to the *Second* prong of the prima facie case (i.e., employment actions disadvantaging Ruiz). *See King v. Town of Hanover,* 116 F.3d at 968.

The *Third* requirement to be shown is a causal connection between the protected activity and the adverse employment actions. Ruiz states that after she spoke to Marrero regarding her problems with Rafael Rivera, Marrero in turn informed Rafael Rivera of the meeting. (Docket No. 39, Exh. 11, Deposition of Luz N. Ruiz, 3rd session, p. 74 ll. 2–5) ("According to Mr. Rivera one day he claimed to me that I didn't have to complain to anyone, that I had gone to Marrero to complain about him, that that was going to create problems for me."); (Docket No. 23, Exh. 1, Sworn Statement by Luz N. Ruiz, para. 8) ("The only thing that Mr. Marrero did regarding this issue was to inform Mr. Rivera that I complained. When Rivera told me that I had complained to Marrero I got scared and did not try any further contact with Mr. Marrero."). However, having found that Plaintiff had not engaged in a protected activity which CRI knew of, consequently, Ruiz' showing of a causal connection to an employment action falls by the wayside. Even if Ruiz could somehow establish a protected activity which CRI knew of, there still remains the absence of evidence to the effect that CRI retaliated against Ruiz for reporting of sexual discrimination. After all reasonable inferences are drawn in Ruiz' favor, there is insufficient evidence to uphold the subject prima facie causal connection requirement. *See King v. Town of Hanover,* 116

F.3d at 968. (Plaintiff "must point to evidence in the record that would permit a rational factfinder to conclude that the employment action was retaliatory."). Thus, the prima facie case fails and CRI is hereby granted summary judgment on Ruiz' Retaliation cause of action.

Accordingly, the Court **GRANTS IN PART** CRI's request for summary judgment and **DISMISSES** this cause of action.

## C. HOSTILE ENVIRONMENT

"Under the teaching of *Meritor,* conduct rises to the level of actionable sexual harassment only when it is: sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Morgan,* 901 F.2d at 190 (quoting *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986)). Upon the facts demonstrated in the record, the Court finds there is a genuine issue of fact as to whether Ruiz was subjected to a hostile work environment. CRI does not forcefully contest that a genuine issue of fact exists for this hostile work environment cause of action. Instead, CRI asserts that even if Ruiz shows an issue of fact does exist regarding whether the work environment created by Rafael Rivera was hostile, an affirmative defense obviates this cause of action. The Court disagrees.

CRI brought to the attention of the Court the holdings of two recent successive Supreme Court cases, which CRI believes are determinative in the context of the instant action. The holding in those cases are identical and is as follows:

An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. **When no tangible employment action is taken,** a defending employer may raise an affirmative defense

to liability or damages, subject to proof by a preponderance of the evidence, see Fed.Rule Civ.Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an anti-harassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. **No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.**
*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, ——, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998) (emphasis added); *Faragher v. Boca Raton*, 524 U.S. 775, ——, 118 S.Ct. 2275, 2292–2293, 141 L.Ed.2d 662 (1998).

The Court has previously held in this Order that Ruiz has created a genuine issue of fact regarding her prima facie case for *quid pro quo* sexual discrimination. The fourth element of the prima facie case asks whether Ruiz' reaction to the sexual harassment elicited a reprisal which affected a tangible aspect of her employment. CRI dispelled this presumption by articulating valid nondiscriminatory reasons for the adverse employment actions. Lastly, Ruiz created a genuine issue of fact regarding whether the nondiscriminatory reasons proffered by CRI were but a pretext for sex discrimination animus. Therefore, for the same underlying reasons as the above holdings, the Court now finds that it is an issue for the jury to decide, whether a tangible aspect of Ruiz' employment (such as discharge, demotion, undesirable reassignment, etc.) was the result or culmination of sexual discrimination by her supervisor, Rafael Rivera.

Above, the Court held Ruiz has established a genuine issue of fact as to whether she was subjected to a hostile work environment. "No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Id.* Derivatively, summary judgment is **DENIED** for the hostile work environment sexual discrimination cause of action.

## D. CLAIMS UNDER PUERTO RICO LAW

Plaintiff has alleged violations of Puerto Rico law arising out of the same nucleus of facts giving rise to her federal claims. Essentially, Plaintiff claims a violation of the Puerto Rico Employment Discrimination Law and Anti–Sex Harassment Law, P.R.Laws Ann., tit. 29 §§ 146 et seq. and 155 et seq. ["Law 100" and "Law 17 respectively"], and appends a statutory tort claim under Civil Code section 1802 for damages for the result of the harm suffered, P.R.Laws Ann., tit. 31 § 5141.

Previously with regard to Puerto Rico Law 100 [11] claims and the accompany-

---

11. Puerto Rico Law 100, P.R.Laws Ann., tit. 29 § 148 (1985), in pertinent part provides: "Any employer who discharges, lays off or discriminates against an employee regarding [her] salary, wage, pay or remuneration, terms, rank conditions, or privileges of [her] work, or who fails or refuses to hire or rehire a person, or who limits or classifies [her]

ing burden-shifting standard thereunder, this Court in *Maldonado–Maldonado v. Pantasia Mfg. Corp.*, 983 F.Supp. 58, 65–6 (D.P.R.1997) was guided, as it is now, by the Supreme Court of Puerto Rico cases such as *Narvaez v. Chase Manhattan Bank*, 120 P.R.Dec. 731, 1988 WL 580838 (1988); *Baez Garcia v. Cooper Lab.*, 120 P.R.Dec. 145, 1987 WL 448243 (1987); *Ibanez v. Molinos de P.R., Inc.*, 114 P.R.Dec. 42, 1983 WL 204221 (1983), and the interpretations thereof by the federal courts, such as *Alvarez–Fonseca v. Pepsi Cola of P.R. Bottling Co.*, 152 F.3d 17, 27–9 (1st Cir.1998); *De Arteaga v. Pall Ultrafine Filtration Corp.*, 862 F.2d 940, 941–44 (1st Cir.1988); *Menzel v. Western Auto Supply Co.*, 848 F.2d 327, 330–31 (1st Cir.1988); *Dominguez v. Eli Lilly and Co.*, 958 F.Supp. 721, 741–45 (D.P.R.1997). Much like a Title VII action, under Law 100 the employee bears the initial burden of presenting sufficient, probative evidence that she was discharged without just cause, this entails showing (a) that she was actively or constructively discharged and (b) the discharge was without "just cause." [12] *Landrau Romero v. Caribbean Restaurants, Inc.*, 14 F.Supp.2d 185, 193 (D.P.R.1998) (citing *Dominguez v. Eli Lilly And Co.*, 958 F.Supp. 721, 741 (D.P.R.1997); *Borre-*

*ro–Rentero v. Western Auto Supply Co.*, 2 F.Supp.2d 197 (D.P.R.1998); *Arthur Young & Co. v. Virgilio Vega III*, 94 J.T.S. 75 at 11962, 11972 (1994)). Once the Plaintiff proffers sufficient evidence to sustain a prima facie case a rebuttable presumption is established. *See* P.R.Laws Ann., tit. 29 § 148 (1985); [13] *see also Alvarez–Fonseca v. Pepsi Cola of P.R. Bottling Co.*, 152 F.3d at 27.

■ As illustrated previously above, once a Plaintiff establishes a prima facie case under Title VII, the burden of production shifts to the Defendant but the Plaintiff retains the burden of persuasion throughout the entire proceedings. *See e.g. St. Mary's Honor Ctr. v. Hicks*, 509 U.S. at 507–12, 113 S.Ct. at 2747–750. Under Law 100, however, upon a satisfactory showing of a prima facie case by Plaintiff not only does the burden of production shift to the Defendant but also the burden of persuasion. *Alvarez–Fonseca v. Pepsi Cola of P.R. Bottling Co.*, 152 F.3d at 27 (citing *Ibanez v. Molinos de P.R., Inc.*, 114 P.R.Dec. 42, 52, 1983 WL 204221 (1983)). "Thus, in order to rebut the Law 100 presumption, the employer must prove, by a preponderance of the evidence, that the

employment opportunities, or to affect his status as employee, on the basis of ... sex, ... shall incur civil liability ... and [ ] he shall be guilty of a misdemeanor.".

12. Because Law 100 does not provide a definition of "just cause" Puerto Rico courts have adopted the guidelines for justifiable dismissals under Puerto Rico law contained with Law 80. *Baez Garcia v. Cooper Lab.*, 120 P.R.Dec. 145, 155, 1987 WL 448243 (1987); *see also* P.R.Laws Ann., tit. 29 § 185b (Supp. 1991). Title 29, § 185b:

"Just cause for the discharge of an employee form an establishment shall be understood to be:
(a) That the worker indulges in a pattern of improper or disorderly conduct.
(b) The attitude of the employee of not performing his work in an efficient manner; or of doing it belatedly and negligently or in violation of the standards of quality of the product produced or handled by the establishment.

(c) The employee's repeated violations of the reasonable rules and regulations established for the operation of the establishment, provided a written copy thereof has been opportunely furnished to the employee.
(d) Full, temporary or partial closing of the operations of the establishment.
(e) Technological or reorganization changes as well as changes of style, design or the nature of the product made or handled by the establishment, and changes in the services rendered to the public.
(f) Reductions in employment made necessary by a reduction in the anticipated or prevailing volume of production, sales or profits at the time of the discharge."

13. "Any of the acts mentioned in the preceding sections shall be presumed to have been committed in violation of sections 146–151 of this title, whenever the same shall have been performed without good cause. This presumption shall be of a controvertible character." P.R.Laws Ann., tit. 29 § 148 (1985).

challenged action was not motivated by discriminatory [sex] animus." *Id.* at pp. 27–8. "As the *Ibanez* Court pointed out, Law 100 is much more plaintiff-friendly than its federal counterpart."[14] *Dominguez v. Eli Lilly and Co.,* 958 F.Supp. at 744.

 Plaintiff has shown that she was discharged. The Court extrapolates from the analyses of the *quid pro quo* cause of action that Ruiz has created a genuine issue of fact as to whether her discharge was without "just cause" via her prima facie case. Consequently, the Court believe a genuine issue of fact sufficiently extends to CRI's rebuttal of the presumption of showing "just cause" for the adverse employment decisions taken against Ruiz. Also, because Ruiz went on to create a genuine issue of fact concerning CRI's valid nondiscriminatory reasons being but a pretext for sexual discrimination, an issue of fact remains with reference to the employer's showing of "just cause" discharge.

Puerto Rico's Anti–Sexual Harassment Law, Law 17, causes of action are nearly identical to the EEOC's guidelines for Title VII sex discrimination causes of action, that is *quid pro quo* and hostile work environment. *See* P.R.Laws Ann., tit. 29 § 155c (Supp.1991). "Furthermore, Law 17 calls for a totality of the circumstances analysis parallel to that of Title VII." *Landrau Romero v. Caribbean Restaurants, Inc.,* 14 F.Supp.2d at 193 (citing P.R.Laws Ann., tit. 29 § 155c (Supp.1991)).

The Court has held above that a genuine issue of fact existed as to Plaintiff's claims for *quid pro quo* and hostile work environment sexual harassment. Therefore, the Court holds likewise, that summary judgment is inappropriate as to the alleged violations of Puerto Rico's Anti–Sexual

Harassment Law, Law 17. *See* P.R.Laws Ann., tit. 29 § 155c (Supp.1991).

Puerto Rico Civil Code section 1802 calls for damages because the acts or omissions of CRI through fault or negligence caused harm to Ruiz. P.R.Laws Ann., tit. 31 § 5141 (1956) ("A person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done."). The general tort claim of Plaintiff under § 1802 is derivative of her claims under the above cited labor statutes, P.R.Laws Ann., tit. 29 §§ 146 et seq. and 155 et seq. *Santini Rivera v. Serv Air, Inc.,* 137 D.P.R. ——, 94 J.T.S. 121, 1994 WL 909527 (1994). Because Plaintiff's causes of action pursuant to the local statutes are sustained under the summary judgment standard, her claim for damages under this statute are necessarily upheld.

## V. CONCLUSION

In sum, the Court believes at this summary judgment juncture, the causes of action, with the exception of the Plaintiff's retaliation claim, in this case are simply too imbued with issues of motive and intent, notwithstanding the effort proffered, which preclude the Court from the granting of CRI's motion. *See e.g. Poller v. Columbia Broad. Sys.,* 368 U.S. at 473, 82 S.Ct. at 491. While finding that there is a jury question as to "pretext" and "discriminatory animus." *Fennell,* 83 F.3d at 535, the Court notwithstanding notes that the evidence proffered by the Plaintiff required the stretching of reasonable inferences afforded to the nonmovant in this summary judgment proceeding to their furthest elasticity.

WHEREFORE, Defendants' Motion For Summary Judgment (Docket No. 22)

---

**14.** "Consequently, the burden of proof on the ultimate issue of discrimination remains with the plaintiff, as in any other civil case. The plaintiff must prove that, even if the dismissal was justified, the defendant nevertheless violated Law 100 because the dismissal was motivated by discriminatory animus instead of or in addition to the legitimate reasons for dismissal. The Law 100 plaintiff is then in [the] same situation as an ADEA plaintiff after the defendant has articulated a legitimate, nondiscriminatory reason for its actions." *Alvarez–Fonseca v. Pepsi Cola of P.R. Bottling Co.,* 152 F.3d at 28.

is hereby **GRANTED IN PART** as to the Plaintiff's retaliation claim and it is therefore **DISMISSED,** and the motion is **DENIED IN PART** as to the remainder of Plaintiff's causes of action.

IT IS SO ORDERED.